## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| JAMES H. JACOBY, AS TRUSTEE ON BEHALF OF THE INDENTURE OF TRUST OF RICHARD A. JACOBY DATED OCTOBER 31, 1992<br>1349 Colton Road<br>Gladwyne, PA 19035<br><br>        Plaintiff,<br><br>        v.<br><br>AXA EQUITABLE LIFE INSURANCE COMPANY<br>1290 Avenue of the Americas<br>New York, NY  10104<br><br>        Defendant. | CIVIL ACTION NO.<br><br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

James H. Jacoby, as Trustee ("Trustee" or "Plaintiff") of the Indenture of Trust of

Richard A. Jacoby dated October 31, 1992 ("Trust"), by and through his undersigned counsel,

Bochetto & Lentz, P.C., brings this action on behalf of the Trust as follows:

### I.   NATURE OF ACTION

1.     This is a Fraud, Breach of Contract, Insurance Bad Faith, Promissory Estoppel, and

Unfair Trade Practices and Consumer Protection Law ("UTPCPL") action wherein Plaintiff was

the lawful owner and beneficiary of a whole-life insurance policy, unceremoniously cancelled by

Defendant without proper notice, causing Plaintiff to lose the value of a $450,000 whole-life

insurance policy.  After paying premiums for nine years, Plaintiff secured a written confirmation

in 1993 from Defendant that, due to the "vanishing premium" feature of the policy, no further premiums were due at least until 2013. Despite providing such written assurance, Defendant unilaterally and without basis cancelled the policy shortly thereafter in 1993 without informing the Insured, the Beneficiary, the Trustee, or counsel for the Trust.

2.      Since the discovery of Defendant's wrongdoing, Plaintiff has learned the foregoing fact pattern was not fortuitous; rather, Defendant's actions were part of a well orchestrated scheme launched by the insurance industry (as well as Defendant) in the 1980's against hundreds of thousands of unwitting consumers.

3.      The scheme, often referred to as "Vanishing Premiums," was observed to be one of the most aggressive techniques used to sell new insurance policies. Using complex actuarial tables, the insurance companies would (and Defendant did so instantly) generate sales illustrations demonstrating to the customer how, after making a limited number of premium payments, the dividend from those payments would be sufficient to pay the remainder of the premiums on the policy. As a result, after paying a set number of premiums, the necessity of paying the premium would "vanish," the insured would no longer have to make additional premium payments, and the insured would then own the policy and be entitled to its benefit in perpetuity.[1]

---

[1] In a vanishing premium plan, the policyholder pays higher-than-normal premiums in the early years of the policy and, by doing so, a higher fraction of premium dollars is distributed into the policy's savings account (i.e., accumulation fund), allowing the cash value of the policy to accumulate faster. The advertised goal of a vanishing premium plan is to set premiums at a level where, after a certain number of years, enough cash value has accumulated within the policy so that future administrative and insurance costs can be paid out of the accumulation fund, with no further out-of-pocket payments by the policyholder. In the mid–1980s, when the new policies were marketed most aggressively, the assumption of most vanishing premium "illustrations" was that no further out-of-pocket premiums would be required after five or ten years. *Drelles v. Manufacturers Life Ins. Co.*, 2005 PA Super 249, 881 A.2d 822, 828 (Pa. Super. Ct. 2005) citing Daniel R. Fischel & Robert S. Stillman, *The Law and Economics of Vanishing Premium Life*

4.       Over the years, the "vanishing premium" sales phenomenon mushroomed, and insurance companies, including Defendant, intensely competed against each other so armed.  As the "vanishing premium scandal" came to light, Money Magazine dubbed "vanishing premiums" as one of the "Eight Biggest Rip-Offs in America."  (MONEY Magazine, August, 1995.)

5.       What followed was extensive litigation against insurance companies, including Defendant, for their role in peddling the "vanishing premium" scheme, including numerous class actions and many multi-million dollar verdicts against carriers.

6.       As set forth at length below, Plaintiff is a victim of the classic "vanishing premium" scam perpetrated by Defendant, and is entitled to damages, including punitive damages.

## II.   PARTIES

7.       James H. Jacoby ("Trustee") is an adult individual over the age of twenty-one years old, and is the Trustee of the Indenture of Trust of Richard A. Jacoby dated October 31, 1992 ("Trust").  The Trust is the lawful owner and beneficiary of the whole-life insurance policy issued by AXA Equitable Life Insurance Company on February 20, 1984, Policy No. 84 025 858 ("Policy") on the insured, Richard A. Jacoby ("Insured").  The Trustee is bringing this action on behalf of the Trust.

8.       Defendant AXA Equitable Life Insurance Company[2] ("Defendant") is a New York

---

*Insurance,* 22 Del. J. Corp. L. 1, 5 (1997).

[2] As of January 1, 1997, Equitable Variable Life Insurance Company was merged into The Equitable Life Assurance Society of the United States and ceased to exist as a company.  On September 7, 2004, The Equitable Life Assurance Society of the United States officially changed its name to AXA Equitable Life Insurance Company.  *Fellure v. Equitable Variable Life Ins. Co.,* 2005 WL 3115851, *1, fn. 1 (S.D.W. Va. Nov. 21, 2005).

corporation with a principal place of business at 1290 Avenue of the Americas, New York, NY 10104.  Defendant issued Policy No. 84 025 858 to the Insured on February 20, 1984.  (A "specimen policy" provided by Defendant with respect to Policy No. 84 025 858 is attached hereto as Exhibit "A.")

### III.   JURISDICTION AND VENUE

9.      The subject matter jurisdiction of this Court is based upon 28 U.S.C. §1332, in that there is complete diversity of citizenship among the parties, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391, in that a substantial part of the events giving rise to this action occurred in this District.

### IV.   FACTUAL BACKGROUND

#### A.      The Policy

11.      On February 20, 1984, Defendant issued a life insurance policy to Richard A. Jacoby ("Insured") in the face amount of $450,000.  (Exhibit "A.")

12.      The Policy, No. 84 025 858, was a whole-life product known by Defendant as "Whole Life 100 Plan Insurance."  (*Id.*)

13.      The Policy was marketed and sold as a "Vanishing Premium Policy," which, according to Defendant, after a certain number of annual premiums were paid on the Policy, the dividends from the premiums would be used to pay all future annual premiums.  As a result, no future premiums would be due on the Policy as the dividends from the previously paid premiums would pay the future premiums.

14.      The Insured was advised that pursuant to this Policy, after the first nine annual

premiums were paid to Defendant, no further premiums would have to be paid.

15.     On December 28, 1992, the Insured assigned the Policy to the Trust.  (A true and correct copy of the December 28, 1992 Assignment ("Assignment") is attached hereto as Exhibit "B.")

16.     Pursuant to the Assignment, James H. Jacoby was named as the Trustee and the mailing address of the Trust was listed as "David R. Glyn, Esquire, Wolf, Block, Schorr & Solis-Cohen, 15th & Chestnut Streets, Philadelphia, PA  19102."  (Id.)

17.     On December 28, 1992, the Insured completed a form provided by Defendant in order to change the owner and beneficiary of the Policy consistent with the Assignment.  This form, along with a cover letter containing instructions, was mailed to Defendant's representative, Karr-Barth Associates.  (True and correct copies of the December 29, 1992 letter and attachment are attached hereto as Exhibit "C.")

18.     On January 13, 1993, Defendant's representative, Johnsie H. Boyd, signed the bottom of the form provided by Defendant, certifying that the changes of owner, beneficiary, and address with respect to the Policy were recorded by Defendant.  (Id.)

19.     Between 1984 and 1992, Defendant mailed Notices of Payment Due to the Insured (or the Insured's representatives).  In response, the annual premiums were timely paid on the Policy.

20.     Over the years, approximately $77,341.50 was paid to Defendant in premium payments on the Policy.

**B.     The Illustration**

21.     On January 27, 1993, the Trust's counsel, David Glyn, Esquire, received a Notice

-5-

of Payment Due from Defendant.  (A true and correct copy of the January 27, 1993 Notice of

Payment Due is attached hereto as Exhibit "D.")

22.    Consistent with the instructions set forth in the December 29, 1992 letter (Exhibit

"C"), the Notice of Payment Due was properly addressed to the Trustee, c/o Trust's counsel at

15th & Chestnut Streets, Philadelphia, PA 19102 and specified that payment must be received by

February 20, 1993.  (*Id.*)

23.    The Notice of Payment Due was seeking a tenth annual premium payment on the

Policy.  (*Id.*)

24.    Thereafter, the Trust's counsel promptly sent a letter to the Insured enclosing a

copy of the Notice of Payment Due.  (A true and correct copy of the January 29, 1993 letter from

David R. Glyn, Esquire to the Insured is attached hereto as Exhibit "E.")

25.    When the Insured received this correspondence, he promptly contacted the Trust's

counsel and alerted him to the fact that the Policy was a "Vanishing Premium Policy" with the last

premium due on February 1992.  (A true and correct copy of the Insured's February 1, 1993 letter

to the Trust's counsel is attached hereto as Exhibit "F.")  Indeed, the Insured had been advised on

numerous occasions that no further premiums would be due on the Policy after the payment of

nine annual premium payments.[3]

26.    In this letter, the Insured stated that he had "asked Cathy (sic) at Howard

Silverman's office to check with [Defendant] to determine whether this premium notice can be

---

[3] There is no requirement in Pennsylvania that a non-commercial life insurance customer must scrutinize an insurance policy to ascertain its provisions and thereby determine whether the policy accords with the insurance agent's representations and meets the insured's expectations. *Drelles v. Manufacturers Life Ins. Co.*, 881 A.2d 822 (Pa. 2005) citing *Rempel v. Nationwide Life Insurance Company, Inc.*, 323 A.2d 193, 197 (Pa. Super. 1974), *aff'd* 370 A.2d 366 (Pa. 1977).

disregarded." (*Id.*)

27.     In the event the premium was due, the Trust would have paid the Notice of

Payment Due to Defendant.  (Exhibits "E" and "F.")

28.     On March 18, 1993, the Insured received a letter from Kathy Krakoski, HAS

Corporation (Howard Silverman's office), which enclosed an illustration ("Illustration") from

Defendant, providing that no premiums were owed on the Policy.  (A true and correct copy of the

March 18, 1993 letter and Illustration are attached hereto as Exhibit "G.")

29.     Specifically, the letter states as follows:  "Enclosed is the Equitable Life

illustration you requested **showing existing dividends being used to pay the premiums**.  As you

will see from this illustration, **this will keep your policy in-force without having to pay any**

**additional premiums.**"  (*Id.*)(Emphasis added.)

30.     The Illustration, which clearly specified that it is for Policy No. 84 025 858,

unequivocally demonstrates that there were no premiums due on the Policy in 1993 and none

would be due through February 2013.  (*Id.*)

31.     The Illustration also properly denoted the Optional Pay Program for the Policy as

being Dividends to Additions, which was elected on the Policy.  (*Id.*)  This is noteworthy as the

Illustration further confirmed the Insured's understanding that the Policy was a "vanishing

premium" policy.

32.     In complete and justifiable reliance on the written Illustration provided by

Defendant that no premiums were due now and until at least February 2013, the Trust did not pay

the Notice of Payment Due.

33.     The Trust, by and through its Trustee and counsel, was comfortable with the

representations of Defendant set forth in the Illustration that no new premiums would be due until February 2013.

34.     Despite the fact that the due date on the Notice of Payment Due was February 20, 1993, and Defendant did not receive a premium payment from the Trust as a result of Defendant's Illustration, Defendant *never* sent any notice to the Insured, the Trustee, or the Trust's counsel, notifying them that the Policy was in jeopardy of being cancelled or converted to another type of policy as a result of non-payment.

35.     Between 1993 and 2013, Defendant *never sent any such notices* to the Insured, the Trustee, or the Trust's counsel.

36.     Between 1993 and 2013, Defendant *never* placed any telephone calls to the Insured, the Trustee, or the Trust's counsel, to alert them that the Policy was in jeopardy.  Indeed, there was no contact whatsoever from the Defendant to anyone concerning any aspect or the status of the Policy.

### C.     The Discovery

37.     On March 1, 2013, counsel for the Trust sent a letter to Defendant requesting the most recent annual statement for the Policy as well as the current death benefit and cash surrender value. (A true and correct copy of the March 1, 2013 letter is attached hereto as Exhibit "H.")

38.     On March 22, 2013, Defendant responded to counsel for the Trust as follows:

We have thoroughly reviewed our records with the information you provided and regret to inform you that the **policy terminated effective August 2, 2004 due to Term Expiry**.  For this reason, this policy does not have any value.

(A true and correct copy of the March 22, 2013 letter is attached hereto as Exhibit "I.")(Emphasis added.)

-8-

39.     In response to this alarming news, on behalf of the Trust, the Trustee sent a letter to Defendant complaining about the lack of any notice and demanding additional information.  (A true and correct copy of the May 10, 2013 letter is attached hereto as Exhibit "J.")

40.     Thereafter, on May 23, 2013, Defendant sent a letter responding to the inquiries of the Trust's counsel as follows:

> According to our records, premiums were paid to February 20, 1993.  When no further premiums were received and in accordance with the terms of the policy, it was placed on the non-forfeiture option of Paid-Up Extended Term (PUXT) insurance.  Under PUXT, the net cash surrender value is used to purchase term insurance with an expiry date of August 2, 2004.  The length of time that coverage will continue depends on the net cash surrender value on the default date as the value decreases daily until it reaches zero on the expiry date.  The policy then terminates without value.
>
> A letter would have been generated in early 1993 advising the client of the PUXT status and advising that the policy could be reinstated to a premium paying contract.  Please note that our retention period for this type of document is 10 years and therefore, we do not have a copy of the letter.  *AXA Equitable does not send notice of policy termination when it is on PUXT.*

(A true and correct copy of the May 23, 2013 letter is attached hereto as Exhibit "K.")(Emphasis added.)

41.     It is noteworthy that neither the Insured, the Trust, the Trustee, nor counsel for the Trust ever received a notice, of any kind, regarding the policy being converted to "PUXT."

42.     Moreover, Defendant never notified the Insured, the Trust, the Trustee, and/or counsel for the Trust that the premium was overdue which purportedly caused the Policy to be converted to PUXT in the first instance.

43.     Further, once the policy was converted to PUXT in early 1993, Defendant never sent Plaintiff (or anyone else for that matter) annual statements or other notices – not even a notice in August of 2004 advising Plaintiff that the Policy had expired.

44.     Thereafter, on June 28, 2013, Defendant sent another letter to counsel for the Trust attempting to further justify its conduct.  Therein, Defendant explained that if a premium was not paid, within Defendant's standard 31 day grace period, the policy would lapse and "written notification would be mailed to the policy owner at the last known address requesting payment." (A true and correct copy of the June 28, 2013 letter is attached hereto as Exhibit "L.")

45.     The June 28, 2013 letter also indicated that a system-generated Notice of Policy Lapse dated March 20, 1993 was mailed to the address of record requesting payment and then another notice was generated explaining the policy was converted to PUXT.  (*Id.*)

46.     Defendant does not have evidence of such notices and no such notices were ever received by Plaintiff or by anyone on Plaintiff's behalf.

47.     The only premium-related writings received by Plaintiff in the early part of 1993 were the Notice of Payment Due (Exhibit "D") and the Illustration (Exhibit "G").  Significantly, Defendant's Illustration clearly states that no premiums were due on the Policy until at least 2013.

48.     Moreover, the Notice of Payment Due was sent to the correct address in 1993.

49.     Defendant has refused to reinstate the Policy, despite the fact that Defendant issued the Illustration in 1993 which plainly demonstrates that no premiums were due on the Policy and it was unable to provide any proof whatsoever that it sent proper notice to Plaintiff or Plaintiff's representatives.

50.     Thereafter, Plaintiff further investigated the business practices and regulatory compliance of Defendant and its related companies and, for the first time discovered what follows.

-10-

### D. Florida Consent Order - $1.6 Million Fine

51.     The Department of Financial Services, Office of Insurance Regulation for the State

of Florida, commenced a joint investigation with the Department of Legal Affairs against

Defendant for its questionable sales practices during the period January 1, 1982 through May 31,

2003. (A true and correct copy of the Consent Order is attached hereto as Exhibit "M.")

52.     According to the Consent Order, which was signed by Defendant's representatives,

the State of Florida was investigating Defendant's use of the "Vanishing Premium," which was

defined by the Consent Order as follows:

> "Vanishing Premium" relates to a sale of a whole life insurance policy in which
> transaction the policyholder may or may not have received an **illustration**
> depicting that, under certain circumstances, out-of-pocket premiums may have
> been payable for a shorter period than the life of the policy.

(See Exhibit "M," p. 2.)(Emphasis added.)

53.     As a result of the regulatory investigation, Defendant was forced to pay the sum of

$1.6 million to the Florida Department of Legal Affairs and the Insurance Commissioner's

Regulatory Trust Fund. (*Id.* at p. 4.)

54.     Defendant was also required to implement an "Outreach Plan," at its sole expense,

wherein it was required to send its policyholders letters advising them of the "misunderstanding as

to how long they would have to pay premium payments" on the whole-life insurance policies

issued by Defendant, (*Id.* at 12.) According to the "Vanishing Premium Letter," the purpose of

the letter was to advise the policyholders that "[s]ome policyholders might have thought that they

would only have to pay premiums out of pocket for some specified period of time, and then such

type of premium payments would end or 'vanish,' but in fact, the out of pocket premium

-11-

payments have not ended or did not end." (*Id.*)

55.     In this "Vanishing Premium Letter," Defendant promised to "take certain steps in order to rectify the situation." (*Id.*)

56.     While this regulatory action only applied to the State of Florida, Defendant never sent such a letter to Plaintiff or Plaintiff's representatives even though it must have been aware that Plaintiff's policy was represented as a "vanishing premium policy."

57.     Indeed, the Consent Order was executed by Defendant on July 30, 2003, well before the Term Expiry occurred to Plaintiff's policy in 2004.

58.     Given the breadth of the Consent Order, Defendant was on notice of the profound importance of securing all documents (in whatever form) that could be implicated in litigation surrounding these problematic insurance products, regardless of the state in which they were peddled.

### E.     Montana Jury Awards $6.1 Million Against Defendant

59.     Plaintiff has also learned that in 1996, Defendant was held accountable for its "vanishing premium" scheme in Montana after the Supreme Court of Montana upheld a $6.1 million punitive damages award against Defendant. *Cartwright v. Equitable Life Assur. Soc. of U.S.*, 276 Mont. 1, 6, 914 P.2d 976, 980 (1996).

60.     In *Cartwright*, Defendant's insurance agent, LeSuer, sold numerous whole-life insurance policies to the Insureds and told them that they would only have to pay premiums for a finite number of years after which the policy would pay for itself from accumulated dividends from the premium payment. *Id.* at 981-82.

61.     After paying premiums for the finite period, the Insureds received various notices

-12-

from Defendant requesting additional premium payments on the policies. When they contacted

LeSuer about why they had received the premium notices, he told them on numerous occasions

that they were the result of bookkeeping errors at Defendant's home office. *Id.* at 982.

62.     After continuing to receive notices from Defendant, the Insureds tried to contact

LeSuer but learned he had been terminated. Thereafter, they learned from Defendant that there

was no such thing as a whole-life policy that was self-supporting.

63.     By the time they filed suit against Defendant, most of the policies they purchased

from Defendant had been cancelled. Those that were not cancelled had loans against the policies

for the premiums that were not paid.

64.     The Insureds sued both LeSuer and Defendant herein for breach of fiduciary duty,

negligent misrepresentation, negligence, and fraud. *Id.* at 984-85.

65.     Defendant defended itself by asserting a defense that LeSuer was a rogue agent

who broke the company's rules by acting dishonestly and that it should not be held vicariously

liable for LeSuer's conduct. *Id.* at 995-95.

66.     The jury disagreed with Defendant and found against Defendant and awarded the

Insureds $6.1 million in punitive damages. *Id.* at 980.

67.     The Montana Supreme Court carefully reviewed the record to determine whether

the jury's verdict and award against Defendant was warranted. In upholding the verdict and the

award, the Montana Supreme Court made the following findings and observations:

- Defendant's administrative structure in 1993 consisted of a home office in New York, four regional offices at various locations in the country and agency offices covering smaller geographic areas which included various districts. *Id.* at 995.

- Joseph Wanago ("Wanago") was the district manager in Great Falls, Montana for Defendant. He resigned after complaining about the **"exploitation of customers**

-13-

and was told to mind his own business." *Id.*

- Wanago learned that LeSuer was misleading customers and he reported it to Defendant's District Manager who told Wanago **to mind his own business.** *Id.*

- Wanago also complained about LeSuer to the LeSuer's manager and was told it was none of his business and **"the theory by which they operated was buyer beware."** *Id.*

- Wanago explained that LeSuer and other agents were telling people they could buy life insurance for nothing when they were actually tapping an existing policy which eventually became worthless, or borrowing money against the new policy which diminished the value of that policy. *Id.*

- Wanago personally made complaints to Defendant's regional officials and to two different presidents of the company about these practices. *Id.*

- Carol Ann Mathews worked for Defendant's customer relations department in New York. She testified that she handled numerous complaints against LeSuer but **no disciplinary action was ever taken against him by the company.** *Id.*

- LeSuer was terminated not because of his sales practices, but because of his lack of production. *Id.* at 996.

- **There was additional evidence that managerial agents of Defendant were aware of these dishonest sales practices but did nothing to prevent them.** *Id.*

- It can be inferred from the testimony that LeSuer's supervisors or managerial agents approved of his conduct. Indeed, LeSuer's supervisor frequently made disparaging remarks about customers, such as *"piss on 'em."* *Id.*

- Defendant hired LeSuer to sell its policies and LeSuer was assigned to another agent for training. The evidence showed that the training agent was engaged in highly questionable practices. *Id.* at 999.

- Defendant's "intent . . . was to concentrate its resources in those areas of sales and investments which generated profit, and to pay insufficient attention to internal controls that protected its insureds." *Id.* at 1000.

- Defendant's net worth in 1993 was $1,832,462,923. *Id.* at 1001.

- Defendant's "willingness to sacrifice its insureds' best interests to increase profits easily justifies the amount of punitive damages. *Id.*

-14-

68.     Remarkably, the foregoing was not an isolated series of unfortunate events.

F.     ***Wilbourne v. Equitable Life Assurance Society of the U.S.***

69.     In *Wilbourne v. Equitable Life Assurance Society of the United States*, 998 So.2d

430 (Miss. 2008), Defendant was sued for similar fraudulent conduct that it perpetrated against

Plaintiff.

70.     In *Wilbourne*, a trust purchased a whole-life insurance policy from Defendant.

Defendant, by and through its agent, represented that the trust would only have to pay eight years

worth of out-of-pocket premiums and thereafter the policy would sustain itself and the premiums

would "vanish." *Id.* at 433.

71.     After the premiums were paid on the policy for eight years, the trust received a

"Notice of Payment Due" for the ninth annual premium.  The trust made the premium payment

but called the agent to find out whether the payment was due under the "vanishing premium"

promise.  The agent confirmed that the trust did not have any payments due and told the trust to

request a refund.  The trust requested and received a refund from Defendant.  *Id.*

72.     The following year, Defendant sent another "Notice of Payment Due" to the trust.

Once again the trust made the premium payment and contacted the agent to find out whether a

payment was actually due.  The agent again confirmed that no payment was due and the check

was returned by the Defendant to the trust. *Id.*

73.     Thereafter, in 1996 and 1997 the trust received two more "Notices of Payment

Due" but ignored them at the advice of the agent.  Thereafter, the trust did not receive another

"Notice of Payment Due" until 2002.  During this period, the trust believed the policy premiums

had indeed vanished as represented. *Id.*

-15-

74.     In 2002, the trust received a statement from Defendant that demanded repayment for the past premiums or have the policy lapse. *Id.*

75.     Thereafter, the trust filed suit against Defendant for various counts of fraudulent concealment and misrepresentations.  *Id.*

76.     Defendant defended the case by alleging, among other things, that the statute of limitations had lapsed.  While Defendant was successful in the lower court with this argument, the Supreme Court of Mississippi rejected it and reversed and remanded the case for further proceedings.

77.     In reaching this conclusion, the Supreme Court of Mississippi made several noteworthy observations:

- Under the policy, "it is conceivable that after eight out-of-pocket annual premium payments, the policy would become self-sustaining, such that the future premium payments would vanish." *Id.* at 437.

- ". . . the representation here concerned how, not whether, further premiums were to be paid.  The falsity of that representation would not have been apparent from reading the insurance contract which in fact provided that premiums could be paid from the policy proceeds." *Id.*

78.     Thereafter, the case was remanded to the trial court and it promptly settled.

## COUNT I

## BREACH OF CONTRACT

79.     Plaintiff incorporates by reference the preceding paragraphs as if set forth fully herein.

80.     Defendant entered into a lawful contract with the Insured to provide whole-life insurance with the express understanding that after nine annual premiums were paid, dividends on

the premiums would pay all future premiums.

81.     The Insured lawfully assigned all rights, title, and interest to the Policy to the Trust.

82.     Despite providing written assurances that no further premiums were due on the Policy, Defendant breached the contract and converted the Policy to a term life policy without providing notice to Plaintiff or its representatives.

83.     Then, without providing notice to the Plaintiff or its representatives, Defendant used the cash surrender value of the Policy to purchase a term life policy which expired without notice to Plaintiff in 2004.

84.     As a direct and proximate result of Defendant's breach of contract, Plaintiff was injured.

**WHEREFORE**, Plaintiff seeks judgment in its favor as to Count I as follows: The entry of an award requiring Defendant to pay Plaintiff all monetary damages suffered by Plaintiff as a result of Defendant's breaches, including, without limitation, compensatory damages, consequential damages, prejudgment interest, post-judgment interest, and the award of such additional relief as the Court deems just and appropriate.

## COUNT II

### INSURANCE BAD FAITH

85.     Plaintiff incorporates by reference the preceding paragraphs as if set forth fully herein.

86.     Defendant owed Plaintiff a duty under both the common law and 42 Pa. C. S. § 8371 to act in good faith and in a reasonable manner in connection with any and all obligations it

-17-

owes Plaintiff under the Policy.

87.     Defendant breached this duty and, without reasonable basis and with improper motive, acted in bad faith by:

      a.     converting the Policy from a whole-life insurance policy to a term life insurance policy, without notice, after providing written assurances to Plaintiff that no further premiums were due on the Policy;

      b.     using the net cash surrender value of the Policy, without notice to or authorization from Plaintiff, to purchase term insurance;

      c.     failing to send Plaintiff or its representatives annual statements which would have alerted Plaintiff to the unlawful conversion of the whole-life insurance policy to a term life insurance policy;

      d.     failing to make any attempt to contact the Plaintiff or its representatives via letter or telephone concerning the purported overdue annual premium on a $450,000 whole-life insurance policy despite the fact that it had received approximately $77,341.50 in premium payments from Plaintiff or its representatives over the course of nine years;

      e.     destroying records which are pertinent to the Policy despite the fact that Defendant was on notice of numerous lawsuits and regulatory actions across the country concerning the very product at issue in this case – vanishing premium policies;

      f.     allowing fraudulent sales practices to be inflicted on its policyholders solely for profit without regard for the devastating financial consequences of its actions.

88.     As a direct and proximate result of its breach of such duties, Plaintiff was injured.

**WHEREFORE,** Plaintiff seeks judgment in his favor as to Count II as follows:

-18-

(a)     an award of damages against Defendant pursuant to 42 Pa. C.S.A. § 8371(3) in an amount that will fully compensate Plaintiff for reasonable attorneys' fees, expenses, and court costs incurred by Plaintiff in bringing this action;

(b)     an award of punitive damages in Plaintiff's favor and against Defendant pursuant to 42 Pa. C.S.A. § 8371(2);

(c)     an award of interest on the face value of the policy in an amount equal to the prime rate of interest plus 3% pursuant to 42 Pa. C.S.A. § 8371(3); and

(d)     the award of such additional relief as the Court deems just and appropriate.


## COUNT III

### PROMISSORY ESTOPPEL

89.     Plaintiff incorporates by reference the preceding paragraphs as if set forth fully herein.

90.     Defendant promised that it would provide whole-life insurance on the life of the Insured pursuant to the Policy in return for the payment of nine annual premiums.

91.     Defendant should have reasonably expected that its promise would induce action and/or forbearance on the part of Plaintiff.

92.     Indeed, once Plaintiff learned that a Notice of Payment Due was issued for the ninth annual premium, the Insured secured written confirmation from Defendant that no annual premiums were due and that none would be due until 2013.

93.     Plaintiff relied to its detriment on Defendant's promise and representations and

refrained from taking action in reliance on the promise.

94.     Injustice can be avoided only by enforcing Defendant's promise to provide a whole-life insurance policy on the life of the Insured in the form of the Policy issued by Defendant.

**WHEREFORE**, Plaintiff seeks judgment in his favor as to Count III as follows:

(a)     The entry of an award enforcing Defendant's promise to provide whole-life insurance on the life of the Insured and for all monetary damages suffered by Plaintiff caused by Defendant, including, without limitation, compensatory damages, consequential damages, prejudgment interest, and post-judgment interest;

(b)     the award of such additional relief as the Court deems just and appropriate.

## COUNT IV

## FRAUD

95.     Plaintiff incorporates by reference the preceding paragraphs as if set forth fully herein.

96.      Defendant falsely represented to the Insured that the Policy was a "vanishing premium policy" that would fund itself from the dividends after nine annual payments were made on the Policy.

97.     Thereafter, Defendant further falsely represented, by and through the written Illustration, that no additional premiums were due on the Policy until 2013.

98.     The representations were material to the transaction at hand.

-20-

99.     Defendant made these representations with knowledge of their falsity or recklessness as to whether the representations were true or false.

100.    Defendant made these representations with the intent of misleading Plaintiff into relying on the representations.

101.    Plaintiff justifiably relied on Defendant's misrepresentations.

102.    As a direct and proximate result of Plaintiff's justifiable reliance on Defendant's material misrepresentations, Plaintiff was injured as the whole-life policy was cancelled and replaced by a term policy which lost its value and expired – all without notice to Plaintiff.

**WHEREFORE**, Plaintiff seeks judgment in his favor as to Count IV as follows: The entry of an award requiring Defendant to pay Plaintiff all monetary damages suffered by Plaintiff as a result of Defendant's fraudulent misrepresentations, including, without limitation, compensatory damages, consequential damages, prejudgment interest, post-judgment interest, punitive damages, and the award of such additional relief as the Court deems just and appropriate.

## COUNT V

## VIOLATION OF THE UTPCPL - - 73 Pa.C.S.A. § 201-2, § 201-3

103.    Plaintiff incorporates by reference the preceding paragraphs as if set forth fully herein.

104.    Defendant violated the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa.C.S.A. § 201-2, 201-3, 201-9.2(a), by engaging in unfair or deceptive acts or practices in the conduct of selling and maintaining the Policy.

105.    Specifically, Defendant engaged in the following violations of the UTPCPL:

-21-

- Representing that goods or services have characteristics, benefits, or qualities that they do not have;

- Making false or misleading statements of fact concerning the reason for, existence of, or amount of price reductions;

- Engaging in any other fraudulent or deceptive conduct which creates likelihood of confusion or of misunderstanding;

106.   Defendant was absent any privilege or justification for its unfair, deceptive acts and practices.

107.   As a direct and proximate result of Defendant's violation of the UTPCPL, Plaintiff sustained harm by losing the annual premiums paid, the cash surrender value of the Policy, as well as the benefit of Defendant's promise to insure the life of the Insured via a whole-life insurance policy.

108.   As a result of Defendant's numerous violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, Plaintiff is entitled to treble damages and reasonable attorneys' fees pursuant to 73 Pa.C.S.A. § 201-9.2(a).

**WHEREFORE,** Plaintiff seeks judgment in his favor as to Count V as follows: The entry of an award requiring Defendant to pay Plaintiff all monetary damages suffered by Plaintiff as a result of Defendant's violations of the UTPCPL, including, without limitation, treble damages, consequential damages, reasonable attorneys' fees pursuant, prejudgment interest, post-judgment interest, and the award of such additional relief as the Court deems just and appropriate.

Respectfully submitted,

**BOCHETTO & LENTZ, P.C.**

Dated: November 7, 2013

s/ George Bochetto

By: _____
George Bochetto, Esquire
Jeffrey W. Ogren, Esquire
*Attorneys for Plaintiff*

-23-

# EXHIBIT A



| THE INSURED | RICHARD A JACOBY |
|---|---|
| POLICY OWNER | RICHARD A JACOBY |
| FACE AMOUNT | $450,000 |
| POLICY NUMBER | 84 025 858 |

# LIFE INSURANCE POLICY

## AXA EQUITABLE LIFE INSURANCE COMPANY

### 1290 AVENUE OF THE AMERICAS, NEW YORK, NEW YORK 10104

**AGREES**

- To pay the insurance benefits of this policy to the Beneficiary upon receiving proof of the Insured's death, and

- To provide *you (the policy Owner)* with the other rights and benefits of this policy.

These agreements are subject to the provisions of this policy.

**Ten Days to Examine Policy** — If for any reason you are not satisfied with your policy, you may cancel it by returning the policy to us within 10 days after you receive it. If you do, we will refund the premium that was paid.

Karen Field Hazin, Vice President,
Secretary and Associate General Counsel

Mark Pearson, Chairman of the Board,
and Chief Executive Officer

No. 120-06
Life Insurance
Policy

Whole Life 100 Plan. Insurance payable upon death. Premiums payable for life.
Policy participates in dividends.

# Contents

Insurance benefits   **2**
Policy owner and beneficiary   **4**
Premiums, grace, lapse, reinstatement   **4**

Dividends   **5**
Cash value   **5**
Loans, automatic premium loans   **6**

Options on lapse   **6**
General provisions   **7**
Payment options   **8**

Any additional benefit riders and a copy of the application are included in this policy after page 9.

## In this policy:

"We," "our" and "us" mean AXA Equitable Life Insurance Company.

"You" and "your" mean the Owner of the policy at the time an Owner's right is exercised.

# Insurance Benefits

The insurance benefits we pay at the Insured's death include:

- the Face Amount of this policy,

- *plus* any additional benefits due from riders to this policy,

- *plus* any amount due from dividends left under this policy,

- *plus* or *minus* any adjustment for the last premium,

- *minus* any loan (and any loan interest) on the policy.

We will add interest to the resulting amount for the period from the date of death to the date of payment. It will be computed at the interest rate we are then paying under the Deposit Option on page 8.

We will pay these benefits only if premiums have been paid as called for by this policy. However, even if premiums have been discontinued we may still pay certain benefits. See Options on Lapse, page 6.

Payment of these benefits may also be affected by other provisions of this policy. See the Suicide Exclusion, Incontestability and Age and Sex clauses on page 7. Special exclusions or limitations (if any) are listed on page 3.

120-06                    Page 2

```
THE INSURED    RICHARD A JACOBY        REGISTER DATE   FEB 20, 1984

POLICY OWNER   RICHARD A JACOBY        DATE OF ISSUE   FEB 20, 1984

FACE AMOUNT    $450,000                ISSUE AGE,SEX   44, MALE

POLICY NUMBER  84 025 858              BENEFICIARY     SEE PAGE 4
```

```
------------- BENEFITS AND PREMIUMS -------------

      BENEFITS                    ANNUAL PREMIUM       PREMIUM PERO

LIFE INSURANCE                       $8,593.50         FOR LIFE
```

THE FIRST PREMIUM IS $8,593.50 AND IS DUE ON OR BEFORE DELIVERY OF THE
POLICY.  SUBSEQUENT PREMIUMS ARE DUE ON FEB 20, 1985 AND EVERY 12 MONTHS
THEREAFTER DURING THE PREMIUM PERIOD IN ACCORDANCE WITH THE ABOVE PREMIUM
TABLE.

```
--------------- TABLE OF VALUES ---------------
          (SEE PAGES 5 AND 6 FOR DETAILS)
```

| END OF POLICY YEAR | CASH OR LOAN VALUE | REDUCED PAID-UP INSURANCE | EXTENDED TERM INS. YRS. DAYS | END OF POLICY YEAR | CASH OR LOAN VALUE | REDUCED PAID-UP INSURANCE | EXTENDED TERM INS. YRS DAYS |
|---|---|---|---|---|---|---|---|
| 1  | $      0 | $      0 | 0  | 90  | 12     | $ 98,100 | $193,050 | 10 228 |
| 2  | 6,300    | 16,650   | 1  | 310 | 13     | 107,550  | 206,100  | 10 280 |
| 3  | 14,850   | 37,800   | 3  | 304 | 14     | 117,450  | 219,600  | 10 323 |
| 4  | 23,850   | 58,950   | 5  | 164 | 15     | 126,900  | 231,300  | 10 331 |
| 5  | 32,850   | 78,750   | 6  | 262 | 16     | 136,360  | 242,550  | 10 324 |
| 6  | 41,850   | 97,200   | 7  | 261 | 17     | 146,250  | 254,250  | 10 317 |
| 7  | 50,850   | 114,750  | 8  | 182 | 18     | 155,700  | 264,600  | 10 288 |
| 8  | 60,300   | 132,300  | 9  | 65  | 19     | 165,600  | 274,950  | 10 264 |
| 9  | 69,750   | 148,950  | 9  | 255 | 20     | 175,050  | 284,400  | 10 224 |
| 10 | 79,200   | 164,250  | 10 | 38  | AGE 65 | 184,500  | 293,400  | 10 179 |
| 11 | 88,650   | 179,100  | 10 | 148 | AGE 70 | 230,400  | 332,550  | 9  253 |

THESE VALUES FOR THE POLICY ASSUME THAT ALL PREMIUMS ARE PAID.  THEY DO NOT
REFLECT DIVIDEND CREDITS OR LOANS.

```
WL 100(PREFERRED)                                   (1)      PPA-RAE
                             PAGE 3              88-04-29  88-04-29 1233
A3-06                   (CONTINUED ON NEXT PAGE)
```

# Policy Owner and Beneficiary

**OWNER.** The Owner of this policy is the Insured unless otherwise stated in the application, or later changed. As Owner, you can exercise all the rights in this policy while the Insured is living. You do not need the consent of anyone who has only a conditional or future ownership interest in this policy.

**BENEFICIARY.** The Beneficiary is as stated in the application, unless later changed. If two or more persons are named, those surviving the Insured will share equally unless otherwise stated.

We will pay any benefit for which there is no stated Beneficiary living at the death of the Insured to the children of the Insured who then survive, in equal shares. If none survive, we will pay the estate of the Insured.

**CHANGES.** While the Insured is living, you may change the Owner or Beneficiary by written notice in a form satisfactory to us. The change will take effect on the date you sign the notice, except that it will not apply to any payment we make or other action we take before we receive the notice. If you change the Beneficiary, any previous arrangement you made under the Payment Options provision on page 8 is cancelled.

**ASSIGNMENT.** You may assign this policy, but we will not be bound by an assignment unless it is in writing and we have received it. Your rights and those of any other person referred to in this policy will be subject to the assignment. We assume no responsibility for the validity of any assignment.

# Premiums

**AMOUNTS AND DUE DATES.** Page 3 shows the amounts and due dates of premiums and the period for which they are to be paid. Each premium is payable on or before its due date at our Home Office or premium collection office.

You may write and ask us to change the frequency of premium payment. If we approve the change, the new premium will be determined on the rate scale for this policy.

**GRACE PERIOD.** We allow a grace period of 31 days for payment of each premium, after the first premium. The insurance will continue during the grace period.

**LAPSE.** If a premium is not paid by the end of its grace period, the policy will lapse as of the premium due date. If this occurs, all insurance ends, except as stated in the Options on Lapse section on page 6.

Additional benefit riders do not continue beyond the grace period of an unpaid premium.

**REINSTATEMENT.** You may reinstate this policy within five years after lapse, if: (1) the policy has not been given up for its net cash value; (2) you provide evidence of insurability satisfactory to us; (3) you pay all overdue premiums with interest at 6% per year compounded annually; and (4) you repay or reinstate any policy loan, with loan interest.

**PREMIUM ADJUSTMENT.** We will add to the insurance benefits any part of the last premium paid that applies to a period beyond the policy month in which the Insured dies. If the Insured dies during the grace period of an unpaid premium, we will deduct from the benefits the part of the overdue premium for one policy month.

A4-01                              Page 4

# Dividends

We will determine your policy's share, if any, of our divisible surplus annually. It will be payable as a dividend at the end of each policy year if the policy is then in effect with all premiums duly paid. We do not expect any dividend to be paid on your policy before the end of the second policy year.

DIVIDEND OPTIONS. You may choose one of these options:

- CASH: Your dividends will be paid directly to you.

- PREMIUMS: Your dividends will be used to help pay any premium then due.

- DIVIDEND ADDITIONS: Your dividends will be used to provide paid-up additional whole life insurance on the Insured.

- DIVIDEND ACCUMULATIONS: Your dividends will be left with us to accumulate with interest at 3% per year compounded annually. We may allow excess interest each year.

Your dividends will be used to provide dividend additions if you have not advised us otherwise within three months after we mail the dividend notice. While this policy is continued as reduced paid-up insurance, any dividends will be used to provide dividend additions. No dividends are paid under any extended term insurance.

Dividend additions and dividend accumulations existing when the Insured dies, plus any dividend then payable, will be included in the insurance benefits.

"Dividend credits," as used in this policy, means the sum of dividend accumulations, the cash value of dividend additions, and any dividend that has not been applied under an option. The cash value of dividend additions is their reserve, or the original cash dividends if greater.

You may use dividend credits toward making the policy paid-up for its Face Amount. We will do this at your written request on any premium due date when dividend credits plus the reserve on this policy equal the reserve for the paid-up policy. No further premiums are due on a paid-up policy.

You may withdraw dividend credits at any time, if they are not required as security for a loan. If this policy lapses, any dividend credits that are not withdrawn will be applied as part of the net cash value in the Options on Lapse section.

# Cash Value

You may give up this policy for its net cash value at any time while the Insured is living. In the first policy year, however, you may not do this before a date to which premiums have been paid.

NET CASH VALUE. The net cash value is the cash value plus any dividend credits, minus any loan and loan interest.

CASH VALUE. The Table of Values on page 3 shows the cash value of your policy at the end of policy years for which premiums have been paid. Any cash values not shown will be furnished on request. We will determine the cash value as of a date within a policy year with allowance for time elapsed and premiums paid.

The cash value within three months from the date of lapse will be the same as it was on that date. The cash value after three months from the date of lapse, while the policy is continued as reduced paid-up or extended term insurance, is the reserve for the policy based on the Insured's then current age. The cash value of paid-up insurance within 30 days after a policy anniversary will not be less than it was on that anniversary.

# Loans

You may get a loan on this policy while it has a loan value and it is not being continued as extended term insurance. This policy will be the sole security for the loan.

The amount of the loan may not be more than the loan value. Any existing loan and loan interest on it will be deducted from the new loan. We may also deduct any unpaid premium then due.

**LOAN VALUE.** The loan value is the policy's cash value plus any dividend credits on the next premium due date (or the next policy anniversary, if this has become a paid-up policy), minus interest at the loan rate to that date.

**LOAN INTEREST.** Interest on a loan accrues daily, at an annual rate of 8%. We may charge a lower rate for any period of time. Interest is due on each policy anniversary. If the interest is not paid when due, it will be added to the loan and bear interest at the loan rate.

This policy will terminate when a loan with loan interest first equals or exceeds the cash value plus any existing dividend credits. We will mail 31 days'

prior notice to you and any assignee of record at last known addresses.

**REPAYMENT.** You may repay a loan, and loan interest, at any time while the Insured is living, and before the end of the grace period of an unpaid premium. We will deduct any existing loan, and loan interest, from any benefits we pay at the Insured's death.

**AUTOMATIC PREMIUM LOAN OPTION.** While this option is in effect, any unpaid premium will be paid by policy loan as of the end of its grace period. The amount then available as a loan must be large enough to pay the premium. If you are using dividends to help pay premiums, a loan will be made only for the part of the premium in excess of the dividend.

This option will be in effect if asked for in the application or you ask for it in writing before the end of the grace period of an unpaid premium. You may suspend its operation by written notice. This option is not applicable if premiums are paid monthly.

# Options on Lapse

You have a number of options if the policy lapses. You may apply for reinstatement. If there is a net cash value, you may withdraw it and give up the policy. Or, you may continue insurance under one of the following options:

**REDUCED PAID-UP INSURANCE.** This is insurance for the Insured's lifetime and for the amount that the net cash value will buy. This option participates in dividends.

**EXTENDED TERM INSURANCE.** This is term insurance for an amount equal to the Face Amount plus any dividend additions and dividend accumulations, minus any unpaid loan and loan interest. The insurance will continue from the date of lapse for as long a term period as the net cash value will buy. In no event, however, will this period be less than 90 days if premiums have been paid for at least three months before lapse and there is no loan on this policy. This option does not participate in divi-

dends. *This option is not available if so stated on page 3.*

Extended term insurance will apply automatically if you have made no other choice within three months after the date of lapse. Reduced paid-up insurance will apply instead if the extended term insurance option is not available.

If the Insured dies after the grace period but within three months from the date of lapse, the greater of the benefit under reduced paid-up or extended term insurance will apply. In this case, any restriction on page 3 as to extended term insurance will not apply.

We will determine amounts and term periods for these options as of the date of lapse (the due date of the unpaid premium), using net single premiums for the Insured's then current age. We will use net cash values as of the date of lapse, adjusted for any loan or dividend transaction on or after that date.

# *General Provisions*

**THE CONTRACT.** We provide this insurance in consideration of payment of the required premiums. This policy and the attached copy of the application make up the entire contract.

The contract may not be modified, nor may any of our rights or requirements be waived, except in writing signed by our President or one of our Vice Presidents.

**INCONTESTABILITY.** All statements made in the application are representations and not warranties. We have the right to contest the validity of this policy based on material misstatements made in the application. However, this policy will become incontestable after it has been in effect during the lifetime of the Insured for two years from the Date of Issue shown on page 3.

See any additional benefit riders for modifications that apply to them.

**AGE AND SEX.** If the Insured's age or sex has been misstated, any benefits will be those that the premium paid would have purchased at the correct age and sex.

**SUICIDE EXCLUSION.** If the Insured commits suicide, while sane or insane, within two years after the Date of Issue shown on page 3, our liability will be limited to the payment of a single sum equal to the premiums paid, minus any loan and loan interest.

**POLICY PERIODS AND ANNIVERSARIES.** Policy years, policy months, policy anniversaries and premium periods are measured from the Register Date. Each policy month begins on the same day in each calendar month as in the Register Date. If the end of a premium period or policy year is indicated

by an age, it ends on the policy anniversary nearest the birthday on which the Insured reaches that age.

**DEFERMENT.** We may defer payment of a cash value and the making of a loan (other than to pay premiums on policies we have issued) for up to six months after we receive a request. We will allow interest, at a rate of at least 3% a year, on any cash value payment we defer for 30 days or more.

**POLICY CHANGES.** You may change this policy to another plan of insurance or add additional benefit riders or make other changes, subject to our rules at the time of change.

**BASIS OF COMPUTATION.** Cash values, reserves and net single premiums are based on the Commissioners 1958 Standard Ordinary Mortality Table. For any extended term insurance, they are based instead on the Commissioners 1958 Extended Term Insurance Table. Continuous functions are used with interest compounded annually at 4%.

The cash values and paid-up insurance benefits are equal to or more than those required by law. A detailed statement of the method of computing values and benefits has been filed with the insurance supervisory official of the jurisdiction in which this policy is delivered. The cash value at the end of a policy year after the 20th equals the reserve. Reserves referred to in this policy are computed by the Commissioners Reserve Valuation method.

**VOTING RIGHTS.** After this policy has been in effect for one year, you will have the right to vote in the annual election of our Board of Directors. You may do this in person, by mail or by proxy. For more information, write to our Vice President and Secretary.

A6-06                              Page 7

# *Payment Options*

Instead of having the insurance benefits or net cash value paid immediately in one sum, you can choose another form of payment for all or part (if at least $2,500). If you do not arrange for this before the Insured dies, the Beneficiary will have this right when the Insured dies. Arrangements you make, however, cannot be changed by the Beneficiary after the Insured's death. The options are:

1.  DEPOSIT OPTION: Left on deposit for a period mutually agreed upon, with interest paid at the end of each month, each 3 months, each 6 months or each 12 months, as chosen.

2.  INSTALMENT OPTIONS:

    A.  FIXED PERIOD: Paid in equal instalments for a specified number of years (not more than 30). The instalments will not be less than those shown in the Table of Guaranteed Payments on page 9.

    B.  FIXED AMOUNT: Paid in instalments as mutually agreed upon until the amount applied, together with interest on the unpaid balance, is used up.

3.  LIFE INCOME OPTIONS:

    A.  Paid as a monthly income for life in an amount we determine but not less than shown in the Table of Guaranteed Payments on page 9. We guarantee payments for life and in any event for 10 years, 20 years, or until the payments we make equal the amount applied (called "refund certain"), according to the "certain" period chosen.

    B.  Paid as a monthly income for life under any other form of single premium annuity we make available when the policy benefits become payable. Annuity payments will be at least 103% of those determined on a basis consistent with our annuity rates then in effect for a comparable form of annuity.

We guarantee interest under Option 1 at the rate of 3% a year and under Option 2 at 3½% a year, or such higher rates as we may determine. We may allow excess interest dividends under Options 1 and 2. Option 3 does not participate in dividends.

We reserve the right to change how often we make payments, so that each payment is for at least $25. The payee under an option may name and change a successor payee for any amount we would otherwise pay to the payee's estate.

Any arrangements involving more than one of the options, or a payee who is not a natural person (such as a corporation) or who is a fiduciary, must have our approval. Also, details of all arrangements will be subject to our rules at the time the arrangement takes effect. These include withdrawal or commutation rights, designation of payees and successor payees, and evidence of age and survival.

Choices (or any later changes) under these options will be made and will take effect in the same way as a change of Beneficiary. Amounts applied under these options will not be subject to the claims of creditors or to legal process, to the extent permitted by law.

# Table of Guaranteed Payments

## (MINIMUM AMOUNT FOR EACH $1,000 APPLIED)

### Option 2A

#### FIXED PERIOD INSTALMENTS

| Number of Years' Instalments | Monthly Instalment | Annual Instalment |
|---|---|---|
| 1 | $84.70 | $1000.00 |
| 2 | 43.08 | 508.60 |
| 3 | 29.21 | 344.86 |
| 4 | 22.28 | 263.04 |
| 5 | 18.12 | 213.99 |
| 6 | 15.36 | 181.32 |
| 7 | 13.38 | 158.01 |
| 8 | 11.91 | 140.56 |
| 9 | 10.76 | 127.00 |
| 10 | 9.84 | 116.18 |
| 11 | 9.09 | 107.34 |
| 12 | 8.47 | 99.98 |
| 13 | 7.94 | 93.78 |
| 14 | 7.49 | 88.47 |
| 15 | 7.11 | 83.89 |
| 16 | 6.77 | 79.89 |
| 17 | 6.47 | 76.37 |
| 18 | 6.20 | 73.25 |
| 19 | 5.97 | 70.47 |
| 20 | 5.76 | 67.98 |
| 21 | 5.57 | 65.74 |
| 22 | 5.40 | 63.70 |
| 23 | 5.24 | 61.85 |
| 24 | 5.10 | 60.17 |
| 25 | 4.97 | 58.62 |
| 26 | 4.84 | 57.20 |
| 27 | 4.73 | 55.90 |
| 28 | 4.63 | 54.69 |
| 29 | 4.54 | 53.57 |
| 30 | 4.45 | 52.53 |

If instalments are paid each 3 months, they will be 25.32% of the annual instalments. If they are paid each 6 months, they will be 50.43% of the annual instalments.

### Option 3A

#### MONTHLY LIFE INCOME

| AGE | 10 Years Certain | | 20 Years Certain | | Refund Certain | |
|---|---|---|---|---|---|---|
| | Male | Female | Male | Female | Male | Female |
| 50 | $4.50 | $3.96 | $4.27 | $3.89 | $4.28 | $3.87 |
| 51 | 4.58 | 4.02 | 4.32 | 3.94 | 4.35 | 3.93 |
| 52 | 4.67 | 4.09 | 4.38 | 4.00 | 4.42 | 3.99 |
| 53 | 4.75 | 4.16 | 4.44 | 4.06 | 4.50 | 4.05 |
| 54 | 4.85 | 4.24 | 4.50 | 4.12 | 4.58 | 4.11 |
| 55 | 4.94 | 4.32 | 4.56 | 4.18 | 4.66 | 4.18 |
| 56 | 5.04 | 4.40 | 4.62 | 4.24 | 4.74 | 4.25 |
| 57 | 5.15 | 4.49 | 4.68 | 4.31 | 4.83 | 4.33 |
| 58 | 5.26 | 4.58 | 4.74 | 4.38 | 4.93 | 4.41 |
| 59 | 5.37 | 4.68 | 4.81 | 4.45 | 5.03 | 4.49 |
| 60 | 5.49 | 4.78 | 4.86 | 4.52 | 5.13 | 4.58 |
| 61 | 5.62 | 4.89 | 4.92 | 4.59 | 5.24 | 4.67 |
| 62 | 5.75 | 5.00 | 4.98 | 4.66 | 5.35 | 4.77 |
| 63 | 5.88 | 5.12 | 5.04 | 4.73 | 5.48 | 4.88 |
| 64 | 6.03 | 5.25 | 5.09 | 4.80 | 5.60 | 4.99 |
| 65 | 6.17 | 5.39 | 5.14 | 4.88 | 5.74 | 5.10 |
| 66 | 6.32 | 5.53 | 5.19 | 4.95 | 5.88 | 5.22 |
| 67 | 6.48 | 5.68 | 5.24 | 5.01 | 6.03 | 5.35 |
| 68 | 6.64 | 5.83 | 5.28 | 5.08 | 6.18 | 5.49 |
| 69 | 6.80 | 6.00 | 5.32 | 5.14 | 6.35 | 5.64 |
| 70 | 6.97 | 6.17 | 5.35 | 5.20 | 6.53 | 5.79 |
| 71 | 7.15 | 6.34 | 5.38 | 5.26 | 6.71 | 5.96 |
| 72 | 7.32 | 6.53 | 5.41 | 5.30 | 6.91 | 6.13 |
| 73 | 7.50 | 6.72 | 5.43 | 5.35 | 7.12 | 6.32 |
| 74 | 7.67 | 6.92 | 5.45 | 5.38 | 7.34 | 6.52 |
| 75 | 7.85 | 7.12 | 5.47 | 5.42 | 7.58 | 6.73 |
| 76 | 8.02 | 7.32 | 5.48 | 5.44 | 7.82 | 6.96 |
| 77 | 8.19 | 7.53 | 5.49 | 5.46 | 8.09 | 7.21 |
| 78 | 8.36 | 7.75 | 5.50 | 5.48 | 8.38 | 7.47 |
| 79 | 8.52 | 7.96 | 5.50 | 5.49 | 8.67 | 7.75 |
| 80 | 8.67 | 8.16 | 5.51 | 5.50 | 9.00 | 8.05 |
| 81 | 8.81 | 8.36 | 5.51 | 5.51 | 9.34 | 8.39 |
| 82 | 8.94 | 8.55 | 5.51 | 5.51 | 9.70 | 8.73 |
| 83 | 9.06 | 8.73 | 5.51 | 5.51 | 10.10 | 9.12 |
| 84 | 9.16 | 8.90 | 5.51 | 5.51 | 10.52 | 9.53 |
| 85 & over | 9.26 | 9.05 | 5.51 | 5.51 | 10.96 | 9.97 |

Income amounts for Life Income Options are based on age nearest birthday when income starts. Income amounts for ages not shown will be furnished on request.

# AMENDMENT TO APPLICATION

Name of Proposed
Insured or Annuitant **RICHARD A JACOBY**                    Application Dated **NOV 28, 1983**
                     First            Middle Initial         Last

Policy or Contract No. _____ **84 025 858        PPA**

## TO THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES

The application is hereby amended by the undersigned in the following particulars:

**ISSUE WITH REGISTER DATE TO BE FEB 20, 1984.**

ATTACH TO AP:
ASU: PPA - 574

JUL 6 1984

This amendment is to be taken as a part of said application, subject to the agreement therein contained; said application and this amendment thus taken as a whole are to be considered as the basis for and as a part of the policy or contract. To the best of my knowledge and belief, in all other respects the statements and answers in the application continue to be, without material change, true and complete as of the date of this amendment.

Dated at **Phila.**        **PA**        on **3-1** 19 **84**
         (City)          (State)

_____              _____
Signature of Purchaser if other than Applicant        Signature of Applicant
                                      SGN - RICHARD A JACOBY

Agent: **D S GERBER**

Agency: **KARR-BARTH**

180-237E App. Amendment.

## Application Part 1 For Life Insurance To
## THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES

☒REG.  ☐JUV.
☐ESP  ☐OPAI

**1. Proposed Insured** a. Print name to appear on policy.

Richard A. Jacoby
First    Middle Initial    Last

b. ☒Mr. ☐Miss ☐Mrs. ☐Ms. ☐Other Title _____
c. List all current occupations—Give Title(s) and Duties
Senior Vice-President Finance &
General Counsel

d. Date of Birth  2  28  19 4⁴
   Month   Day   Year
e. Age Nearest Birthday  44
f. Place of Birth: State of  PA
g. Residence: State of  PA
h. ☒ Male   ☐ Female

**2. Plan**                    **Amount** of Insurance
WL 100 Series 124B             $ 450,000

**3. Optional Benefits**
☐ Accidental Death Benefit*(Specify Amount): $ _____
☐ Disability Premium Waiver*
☐ Automatic Premium Loan (Not for Term policies, or while premiums are paid monthly)
☐ Option to Purchase Add'l Ins. (Issue ages to 37 only): $ _____
Term Riders: (Only one may be elected for Insured. None available if Proposed Insured is a Child (Issue Age 0-14)
Decreasing Term                                    Per Month
☐ Family Income: _____Years          $ _____
☐ Mortgage Prot.: _____Years  Initial Amt.: $ _____
Renewable Term
☐ On Insured:                        $ _____
☐ On Additional Insured (See page 2): $ _____
☐ Children's Term (See page 2): $ _____ Units
*If Proposed Insured is a Child (Issue Age 0-14) see Limitations on p.2. OPAI and Decreasing Term not available for ESP.

**4. Beneficiary** for Insurance on Proposed Insured. Include Full Name and Relationship to Proposed Insured. TRUSTEE OF RESIDUARY TRUST UNDER LAST WILL & TESTAMENT OF RICHARD A. JACOBY, INCLUDING ANY CODICILS THERETO
Unless otherwise requested, the contingent beneficiary will be the surviving children of the Insured, in equal shares. If none survive, payment will be made to the Insured's estate.
The Beneficiary under any Term Insurance Rider on an Additional Insured or on a Child will be as stated in those riders, unless otherwise designated in Special Instructions.

**5. Owner** Owner's Soc. Sec. or Tax No. 1 9 4 3 0 3 5 5 2 4
The Owner is ☒ Proposed Insured
☐ Applicant for Child (See 10.c.)
☐ Other (Give Full Name):

If "Other", complete the following:
☐Mr. ☐Miss ☐Mrs. ☐Ms. ☐ Other Title _____
Relationship to Insured _____
Specify a successor Owner if desired _____

If the Proposed Insured or the Applicant for a Child is not the Owner and if all persons designated die before the Insured, the Owner will be the estate of the last of such persons to die except where the Insured is a Child (see Note in 10.c.).

**6. Mailing Address** ☒Business (Give Full Name) ☐Residence
R.A. Jacoby
K R A V C O   C O
No.          Street          Apt.
P O   B O X   1 1 3 5
City
K I N G   O F   P R U S S I A   Pa   1 9 4 0 6
State          Zip

**7. Premium Payment Plan**
☒ Annual  ☐ Semi-Annual  ☐ Quarterly
☐ Monthly  ☐ System-Matic (Attach S-M Form)
☐ Single
☐ Military Allotment:  Branch _____
                        Register Date _____
☐ Salary Allotment:  Register Date _____
Unit Name _____
Unit/Sub-Unit No. if established: _____
Divisible by ☐ 2 ☐ 4 Payroll No. _____
☐ Hold Premium $ _____

**8. Dividend Election**
☐ Economatic Type Policies
☒ Additions*          ☐ Premiums
☐ Accumulations       ☐ Cash
☐ Plan 'AD'           ☐ Term Dividend
☐ Plan 'B'            ☐ Provision**
*Not Available for Term policies
**Not Available for Term policies or ESP

**9. Special Instructions**
a. ☐ Preliminary Term to: _____
                        Month  Day  Year
b. ☐ Date to save insurance age: _____
c. ☐ Other: _____

Issue with ALIR provision

Request Reg Date 12/15/83

180-301L                                            1

## 10. Complete if Proposed Insured is a Child (Issue Ages 0-14).

a. Will there be more life insurance in effect on the Child than on any older child in the family?  ☐ Yes ☐ No
If yes, explain: _____

*reduce the chance of a minor Child or the Owner. If all persons designated die before the Child, the Owner will be the Child.*

b. **Applicant**—Complete if other than the Child.
i. _____
   First Name   Middle Initial   Last Name
ii. ☐Mr. ☐Miss ☐Mrs. ☐Ms. ☐Other Title____
iii. Date of Birth _____19___
      Month  Day  Year
iv. ☐ Male ☐ Female
v. Relationship to Child: _____
vi. Total Life Insurance now in effect: $_____

c. **Owner.** If the Applicant is to be the Owner, after the Applicant's death the Child will be the Owner unless otherwise designated in Special Instructions (in any such designation include Owner's Full Name, Relationship to Child, and Social Security or Tax Number).
NOTE: *Consider designating an adult secondary Owner to*

d. **Optional Benefit On Applicant.**
☐ Supplemental Protective Benefit. Give Applicant's:
i. Age Nearest     ii. Place of
   Birthday _____    Birth _____
                               State
iii. Height____Ft.____In. Weight____lbs.
iv. Occupations-Give Title(s) and Duties:_____

*Also answer questions on page 3 as to Applicant.*

e. *Limitations On Child's ADB and DPW Benefits.*
If the Accidental Death Benefit is applied for on the Child, the benefit is payable only if the Child dies after the Child's first birthday.
If the Disability Premium Waiver Benefit is applied for on the Child, the benefit is effective only if the Child becomes totally disabled on or after the Child's 5th birthday.

## 11. Complete for Children's Term Rider.

☐ For Fixed Amount under ESP: Give names of Children below.
☐ For Any Other Amount or Plan: Give Names of Children below and answer the Questions on page 3 as to each Child.

CHILDREN PROPOSED FOR INSURANCE:
NOTE: To be eligible, children (including stepchildren and legally adopted children) must not yet have reached their 18th birthday. Coverage does not begin until a child is 15 days old.

| First Name | Middle Initial | Last Name | Sex | Mo. | Day | Yr. |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

*Date of Birth columns: Mo. Day Yr.*

## 12. Complete for Renewable Term Rider on Additional Insured.

Complete below and answer the Questions on page 3 as to the Additional Insured.

☐ For ESP, the Additional Insured is to be the Spouse (subject to the Spouse amount limit).
PROPOSED ADDITIONAL INSURED
a. Print name as it is to appear on the Policy.
_____
  First   Middle Initial   Last
b. List all current occupations—Give Title(s) and Duties.
_____
_____
_____

c. Date of Birth: Mo._____Day_____Yr. 19___
d. Age Nearest Birthday _____
e. Place of Birth: State of _____
f. Residence: State of _____
g. ☐ Male ☐ Female
h. Owner's Relationship to Additional Insured: _____

## 13. Complete if Using Existing Option to Purchase Insurance.

a. If Option is under Individual Policy:
i. Policy No._____ ii. Option Date_____
iii. Option Amount: $_____
iv. ☐ Regular Option or
   ☐ Option on Birth or Adoption of Child
   Child's Name _____
   Date of Birth or Adoption _____
v. If applying for Disability Premium Waiver, is Proposed Insured now totally disabled as defined in the Disability Premium Waiver provision of the above policy? ☐Yes ☐No

b. If Option is under Group Policy:
i. Policy No._____ ii. Option Date_____

iii. Employer's Name _____
iv. Maximum Amt. Available Under Option: $_____

This application is made under a provision in the policy indicated above permitting the purchase of individual life insurance (the "Option Provision").

If this application is made within the time allowed and in accordance with the other terms in the Option Provision, including timely payment of the full first premium for the option insurance, then the option insurance shall take effect upon the terms of the policy The Equitable would issue. Otherwise, the option insurance shall not take effect.

Answer the Questions on page 3 *only if evidence of insurability is required* in connection with an optional benefit or any excess of the insurance amount applied for over the insurance amount permitted by the Option Provision (the option insurance).

**OTHER INFORMATION—Has any Person Proposed for Insurance:**

14.a.Ever had a driver's license suspended or revoked or, within the last three years, been convicted of two or more moving violations or driving under the influence of alcohol or drugs? (Give full details—including dates, types of violation, and reason for license suspension or revocation.) ☐ Yes ☒ No

b.Any plan to travel or reside outside the U.S.? (Give full details.) ☐ Yes ☒ No

c.Any other life insurance now in effect or application now pending? (State companies and amounts.) ☒ Yes ☐ No

d.Smoked cigarettes within the last 12 months? ☐ Yes ☒ No

15.a.In the last year flown other than as a passenger or plan to do so? ☐ Yes ☒ No
If yes: Total flying time at present _____Hours;
Last 12 mos. _____ Hours;  Next 12 mos. _____Est. Hours.
(Complete Aviation Supplement for pilot instruction; competitive, test, stunt or military flying; or crop dusting.)

b.Engaged within the last year, or any plan to engage in motor racing on land or water, underwater diving, sky diving, ballooning, hang-gliding or parachuting? (If yes, complete Avocation Supplement.) ☐ Yes ☒ No

c.Ever had an application for life or health insurance declined,

that required an extra premium or was otherwise modified? (Give full details.) ☐ Yes ☒ No

d.Replaced or changed any existing insurance or annuity (or any plan to do so) assuming the insurance applied for will be issued? (State companies, plans and amounts.) ☐ Yes ☒ No

**Answer Questions 16, 17 and 18 only if Non-Medical.**

16.Proposed Insured: Height_____ Ft.____ In. Weight_____ lbs.
Additional Insured: Height_____ Ft.____ In. Weight_____ lbs.

**Has any Person Proposed for Insurance:**

17.a.Ever been treated for or had any indication of heart trouble, stroke, high blood pressure, chest pain, diabetes, tumor or cancer? (Give full details.) ☐ Yes ☐ No

b.In the last 5 years, consulted a physician, or been examined or treated at a hospital or other medical facility? (Include medical check-ups in the last 2 years. Do not include colds, minor virus infections, minor injuries, or normal pregnancy.) (Give full details.) ☐ Yes ☐ No

18.a.In the last 10 years used barbiturates, amphetamines, hallucinatory drugs or narcotics? (Give full details.) ☐ Yes ☐ No

b.In the last 10 years received counseling or treatment for the use of alcohol or drugs? (Give full details.) ☐ Yes ☐ No

19.**DETAILS.** For each yes answer give Question number, name of person(s) affected and full details. *For 17 and 18 also include conditions, dates, durations, treatment and results, and names and addresses of physicians and medical facilities.*

| No. | Name of Person Affected | Details |
|---|---|---|
| 14c | INSURED | N.W. Mutual    $10,000.    1957 |
|  |  | Provident Mutual   65,000.   prior to 1970 |
|  |  | Mutual Benefit    50,000. |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

20.**Complete if First Premium is Paid or a Payroll Deduction Authorization is Signed Before the Policy is Delivered:**
Have the undersigned read and do they agree to the conditions of The Equitable's Temporary Insurance Agreement, including (i) the requirement that all of the conditions in that Agreement must be met before any insurance takes effect, and (ii) the $250,000 insurance amount limitation? ☐ Yes ☐ No *(If "No," a premium may not be paid nor a payroll deduction authorization signed before the policy is delivered.)*

☐ Amount Paid: $_____ *(Draw checks to order of The Equitable.)*    ☐ Payroll deduction authorization signed.

**AGREEMENT. Each signer of this application agrees that:**

(1)The statements and answers in all parts of this application are true and complete to the best of my knowledge and belief. The Equitable may rely on them in acting on this application.

(2)The Equitable's Temporary Insurance Agreement states the conditions that must be met before any insurance takes effect, if the full first premium for the policy applied for is paid, or a payroll deduction authorization is signed, before the policy is delivered.

(3)Except as stated in the Temporary Insurance Agreement, no insurance shall take effect on this application: (a) until a policy is delivered and the full first premium for it is paid, or a payroll deduction authorization is signed, while the Proposed Insured is living; (b) before any Register Date specified in this application; and (c) unless to the best of my knowledge and belief the statements and answers in all parts of this application continue to be true and complete, without material

change, as of the time such premium is paid or a payroll deduction authorization is signed.

(4)No agent or medical examiner has authority to modify this Agreement or the Temporary Insurance Agreement, nor to waive any of The Equitable's rights or requirements. The Equitable shall not be bound by any information unless it is stated in application Part 1, 1A or 2.

Dated at _Phila, PA_ on _1/28_ 19_83_
            City        State

(X)_____
Signature of Proposed Insured (Employee for ESP) or of Applicant if Proposed Insured is a Child, Issue Age 0-14.

_____
Signature of Additional Insured if required.

_____
Signature of Purchaser if not Proposed Insured or Applicant. (If corp. show firm's name and signature of authorized officer.)

Signature of Agent ___David Stern___

180-301L                                                                3

**Application Part 2**

☒ To The Equitable Life Assurance Society of the United States
☐ Or To Equitable Variable Life Insurance Company

(180-M205M)

Reason for submission of this form:  ☐ New Policy   ☐ Policy Change   ☐ Reinstatement

1. a. Proposed Insured   First Name   Middle Initial   Last Name   b. Height:____ft.____in.   e. ☒ Male
   (Please Print)  *Richard*   *A.*   *Jacoby*   c. Weight:_____lbs.   ☐ Female
   d. Birth Date: Mo. *2*   Day *28* Yr. *40*

2. a. Name and address of personal physician (or medical facility used instead): *(If none, so state)*  *Howard Sullivan   Bryn mawr medical Bld.*  *Bryn mawr, Pa*

   b. Date and reason last consulted if within the last 5 years: *Sept. 1983   check-up.*

   c. What treatment was given or recommended? *(If none, so state)*  *None*

3. Has Proposed Insured ever been treated for or ever had any known indication of: *(Circle items that apply)*

| | Yes | No |
|---|---|---|
| a. Disease or disorder of eyes, ears, nose or throat? | ☐ | ☒ |
| b. Dizziness, fainting, convulsions; paralysis or stroke; psychiatric, psychological or emotional problem or disturbance; mental or nervous disease or disorder? | ☐ | ☒ |
| c. Shortness of breath; blood spitting; bronchitis, asthma, emphysema, tuberculosis or other chronic respiratory disease or disorder? | ☐ | ☒ |
| d. Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disease or disorder of the heart or blood vessels? | ☐ | ☒ |
| e. Ulcer, hernia, colitis, intestinal bleeding; jaundice, hemorrhoids, or other disease or disorder of the stomach, intestines, liver or gallbladder? | ☒ | ☐ |
| f. Sugar, albumin, blood or pus in urine; stone or other disease or disorder of kidney or bladder? | ☐ | ☒ |
| g. Diabetes; cyst, tumor, or cancer; thyroid or glandular disorder; skin disease or disorder? | ☐ | ☒ |
| h. Neuritis, arthritis, gout, or disease or disorder of the muscles or bones, including the back, or joints? | ☐ | ☒ |
| i. Deformity, lameness or amputation? | ☐ | ☒ |
| j. Allergies; anemia; other blood or lymph disease or disorder? | ☐ | ☒ |
| k. Disorder of prostate, reproductive organs, breasts, menstruation or pregnancy? | ☐ | ☒ |

4. Is Proposed Insured now under observation or taking treatment?  ☐ ☒

5. Has Proposed Insured:
   a. Ever used barbiturates, amphetamines, hallucinatory drugs, heroin, opiates or other narcotics, except as prescribed by a physician?  ☐ ☒
   b. Ever received counseling or treatment regarding the use of alcohol or drugs?  ☐ ☒

6. Other than as stated in answers to Questions 2-5, has Proposed Insured within the last 5 years:
   a. Consulted or been examined or treated by any physician or practitioner?  ☒ ☐
   b. Had any illness, injury, or surgery?  ☒ ☐
   c. Been a patient in or been examined or treated at a hospital, clinic, sanatorium, or other medical facility?  ☒ ☐
   d. Had electrocardiogram, X-ray, or other diagnostic test?  ☒ ☐
   e. Been advised to have any diagnostic test, hospitalization, treatment or surgery which was not completed?  ☐ ☒

7. Has Proposed Insured's weight changed by more than 10 pounds in the last 6 months?  ☐ ☒

8. Have any of the Proposed Insured's parents, brothers or sisters ever had cancer, diabetes, high blood pressure or heart disease before age 60? If yes, specify person and condition.  ☒ ☐

**9. Family History:**

| | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | | *Kidney dr* | 67 |
| Mother | 69 | | |
| Brothers and Sisters | 1 or 3? | | |

DETAILS FOR YES ANSWERS. Include:
  i. Question Number.
  ii. Diagnosis and Treatment.
  iii. Results.
  iv. Dates and Duration.
  v. Names and Addresses of all attending physicians and medical facilities.

*6a.) checkups ≃ yearly.*
*b) Hemorrhoidectomy 1979 ?*
*Bryn mawr Hospital*
*Bryn mawr, Pa.*
*Dr. Ramsey.*
*c) as above in (b).*
*d) EKG, blood, U/A ċ physical.*
*e) Father ċ A.o.D.M. @ ≃ 45 year-of age suffered many complications.*

The above statements and answers are true and complete to the best of my knowledge and belief. I agree that such statements and answers shall be part of the application for insurance or request for policy change or reinstatement, as the case may be. The Insurer may rely on them in acting on the application or making the policy change or reinstatement.

Dated at *King of Prussia, Pa* on *10/27* 19 *83*   Signature of Proposed Insured

Witness:

180-M205M

# AXA Equitable Life Insurance Company
## 1290 Avenue of the Americas, New York, New York 10104

# Life Insurance Policy



Whole Life 100 Plan. Insurance payable upon death. Premiums
payable for life. Policy participates in dividends.

No. 120-06

12-16-1992 02:38PM   FROM HSA 215 667 3690        TO        4302015   P.02

☐ THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES
☐ EQUITABLE VARIABLE LIFE INSURANCE COMPANY
☐ EQUITABLE OF COLORADO

SEPARATE FORMS MUST BE SUBMITTED FOR EQUITABLE, EQUITABLE VARIABLE, AND EQUITABLE OF COLORADO REQUESTS FOR CHANGE OF BENEFICIARY AND/OR OWNER.

## DO NOT RETURN THE POLICY WITH THIS REQUEST

BEFORE COMPLETING THIS REQUEST, PLEASE READ THE INSTRUCTIONS ON THE COVER PAGE AND THE PROVISIONS ON THE REVERSE SIDE OF THIS FORM.

POLICY NUMBER: **84025858**

INSURED/ANNUITANT'S NAME   **Richard A. Jacoby**
First                    Middle              Last

CHANGE OF BENEFICIARY?  ☒ YES   ☐ NO
FULL NAME OF NEW BENEFICIARY, RELATIONSHIP TO INSURED/ANNUITANT, ADDRESS OF ALL NAMED BENEFICIARIES, AND SOCIAL SECURITY NUMBER.

James H. Jacoby, trustee under indenture of trust of Richard A.
Jacoby dated October 31, 1992

*Address — See below*
*E.I # - 23-7715564*

If the proposed Beneficiary or Owner is a Trust, the date of the Trust Agreement or the number of the Trust must be furnished. Our liability under the policy extends when we make payments to a Trustee or succeeding designated payee.

CHANGE OF OWNER?  ☒ YES   ☐ NO
FULL NAME OF NEW OWNER AND RELATIONSHIP TO INSURED/ANNUITANT

James H. Jacoby, trustee under indenture of trust of Richard A.
First

Jacoby dated October 31, 1992                        Relationship
First                    Middle              Last

For                                                   Relationship
or                     Middle              Last

**ATTACH TO APP**

Or                     Organization

**084**

THIS CHANGE IS SUBJECT TO THE PROVISIONS ON THE REVERSE SIDE.

Owner's Address: If applicable, check one and complete.
☒ Address of NEW OWNER is:   ☐ Change address of SAME OWNER to:

Co   James Jacoby Trustee c/o David Glyn, Esq.
     Wolf, Block, Schorr & Solis-Cohen
     15th and Chestnut Streets
Number and Street                         Apt./Suite No.
     Philadelphia, PA 19102
City            State            Zip + 4 Code

Date: December 28 1992
          Month    Day    Year

### SUBSTITUTE FORM W-9 — FOR NEW INDIVIDUAL OWNER ONLY

Federal Law requires that you provide the following Data (see reverse side for explanation):

PART ONE — Enter your taxpayer identification number in the appropriate box. For most taxpayers, this is the Social Security Number. For most Corporations and Trusts, this is the Employer Identification Number.

Social Security #  ☐ | ☐ | ☐   OR   Employer I.D. Number **23-7715564**

PART TWO — Check the box if you are NOT subject to backup withholding under the provisions of section 3406(a)(1)(C) of the Internal Revenue Code ..... ☐

CERTIFICATION — Under penalties of perjury, I certify that this information is true, correct and complete.

Date: December 28 1992
Signature of New Owner          Month    Day    Year

### FOR EQUITABLE/EQUITABLE VARIABLE/EQUITABLE OF COLORADO USE ONLY

The Equitable/Equitable Variable/Equitable of Colorado certifies that this change has been recorded.

Date: January 13, 1993   By: Jeanne A. Boyd

IMPORTANT: Please use typewriter or ball point pen. Press firmly since entries must be legible on both parts. Avoid erasures or alterations. When this page and as duplicate are completed, send both completed copies to us. When we have recorded the change, we will return a copy of the form signed by us as evidence of the change.

TOTAL P.02

# EXHIBIT
# B

A S S I G N M E N T

THIS ASSIGNMENT is made on this 28th day of December, 1992, by and between RICHARD A. JACOBY, 2490 White Horse Road, Berwyn, PA ("Assignor") and JAMES H. JACOBY, TRUSTEE Under Indenture of Trust of Richard A. Jacoby dated October 31, 1992, c/o David R. Glyn, Esquire, Wolf, Block, Schorr & Solis-Cohen, 15th & Chestnut Streets, Philadelphia, PA ("Assignee").

WHEREAS, Assignor has established the above-named trust as an irrevocable trust for the benefit of those parties identified as beneficiaries in the Indenture of Trust; and

WHEREAS, Assignee, as trustee under the said Indenture of Trust has the power and authority to acquire and own insurance policies on the life of Assignor; and

WHEREAS, Assignor now owns certain insurance policies which he desires to assign irrevocably to Assignee as a gift for the benefit of the aforesaid beneficiaries.

NOW, THEREFORE, Assignor, intending to be legally bound hereby, does transfer and assign to Assignee all of Assignor's right, title and interest in and to the following life insurance policies:

| Insurance Company | Policy Number | Original Face Amount |
|---|---|---|
| Phoenix Home Life | 1895133 | $ 200,000 |
| Phoenix Home Life | 1869517 | $ 25,000 |
| Equitable Life Insurance Company | 84025858 | $ 450,000 |
| Provident Mutual Life Insurance Company | 2222655 | $ 50,000 |
| Provident Mutual Life Insurance Company | 2021838 | $ 15,000 |
| Northwestern Mutual Life | 5018275 | $ 10,000 |

Assignor simultaneously herewith is delivering to Assignee the original insurance policy contracts evidencing each of the above enumerated policies assigned herein, and Assignee's execution of this Assignment constitutes Assignee's acceptance of the insurance policies transferred herein and acknowledgment of receipt of the policy documents.

Assignor and Assignee agree to provide such supplementary documentation as may be reasonably requested by either of them or as may be required by any insurance company in order to fully effectuate the assignment of insurance policies accomplished by this instrument as of the date hereof.

-1-

IN  WITNESS WHEREOF, this Assignment has been executed and delivered on
the day first above written.

Witness:                           ASSIGNOR:

*Cheryl C. Wallace*                _____
                                   Richard A. Jacoby

Witness:                           ASSIGNEE:

*Cheryl C. Wallace*                _____
                                   James H. Jacoby, Trustee

— Richard Jacoby —
— pop8five @ comcast.net —

#3612/21/92

-2-

# EXHIBIT

# C

# Richard A. Jacoby

2490 White Horse Road

Berwyn, Pennsylvania 19312

December 29, 1992

Karr-Barth Associates
Brokerage Department
4th Floor
40 Monument Road
Bala Cynwyd, PA   19004

ATTN:  Debbie Griedus

RE  :  Equitable Life Assurance Society Policy No. 84025858
       Insured: Richard A. Jacoby

Gentlemen:

In accordance with instructions received from you, I am enclosing the
following documents with reference to the above policy:

1. Equitable Life form changing beneficiary and owner of the above
   policy.

I would appreciate your calculating the correct gift tax transfer
value for this policy, based upon a gift assignment of the policy on
December 28, 1992. Please supply this information both to myself and to
David R. Glyn, Esquire, Wolf, Block, Schorr & Solis-Cohen, 12th Floor
Packard Building, 15th & Chestnut Streets, Philadelphia, PA 19102-2678.

Also, please have future premium payment notices and other
correspondence directed to the Trustee, c/o David R. Glyn, Esquire, at the
address set forth in the preceding paragraph.

Finally, I would appreciate your acknowledging receipt of this letter
and the enclosures by signing and returning the enclosed copy of this
letter in the envelope that I have included for that purpose.

Very truly yours,

RAJ/cw

Receipt Acknowledged:

Dated: 12/30/92

12-16-1992 02:38PM FROM HSA 215 667 3690 TO 4302015 P.02

☐ THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES
☐ EQUITABLE VARIABLE LIFE INSURANCE COMPANY
☐ EQUITABLE OF COLORADO

SEPARATE FORMS MUST BE SUBMITTED FOR EQUITABLE, EQUITABLE VARIABLE, AND EQUITABLE OF COLORADO REQUESTS FOR CHANGE OF BENEFICIARY AND/OR OWNER.

## DO NOT RETURN THE POLICY WITH THIS REQUEST

BEFORE COMPLETING THIS REQUEST, PLEASE READ THE INSTRUCTIONS ON THE COVER PAGE AND THE PROVISIONS ON THE REVERSE SIDE OF THIS FORM.

POLICY NUMBER(S) **84025858**

INSURED/ANNUITANT'S NAME    **Richard A. Jacoby**
First          Middle        Last

CHANGE OF BENEFICIARY: ☒ YES ☐ NO
FULL NAME OF NEW BENEFICIARY, RELATIONSHIP TO INSURED/ANNUITANT, ADDRESS OF ALL NAMED BENEFICIARIES, AND SOCIAL SECURITY NUMBER.

**James H. Jacoby, trustee under indenture of trust of Richard A. Jacoby dated October 31, 1992**

**Address — See below**

**E.I # — 23-7715564**

If the proposed Beneficiary or Owner is a Trust, the date of the Trust Agreement or the number of the Trust must be furnished. Our liability under the policy ceases when we make payment to a Trustee in accordance designated payee.

CHANGE OF OWNER: ☒ YES ☐ NO
FULL NAME OF NEW OWNER AND RELATIONSHIP TO INSURED/ANNUITANT

**James H. Jacoby, trustee under indenture of trust of Richard A. Jacoby dated October 31, 1992**
First         Middle        Last        Relationship

First         Middle        Last        Relationship

OR
Organization                Relationship

Other

### THIS CHANGE IS SUBJECT TO THE PROVISIONS ON THE REVERSE SIDE

Owner's Address: If applicable, check one and complete.
☒ Address of NEW OWNER is: ☐ Change address of SAME OWNER to:

C/O   **James Jacoby Trustee c/o David Glyn, Esq.**
       **Wolf, Block, Schorr & Solis-Cohen**
       **15th and Chestnut Streets**
Number and Street            Apt/Suite/Bldg.
       **Philadelphia, PA 19102**
City      State      Zip + 4 Code

SIGNATURE OF PRESENT OWNER(S)
(if present Owner is not the Insured/Annuitant, sign and furnish requirements on cover page.)

Date: **December 28 1992**
      Month     Day     Year

### SUBSTITUTE FORM W-9 — FOR NEW INDIVIDUAL OWNER ONLY

Federal Law requires that you provide the following Data (see reverse side for explanation):

PART ONE — Enter your taxpayer identification number in the appropriate box. For most taxpayers, this is the Social Security Number. For most Corporations and Trusts, this is the Employer Identification Number.

Social Security # ☐ OR Employer I.D. Number **23-7715564**

PART TWO — Check the box if you are NOT subject to backup withholding under the provisions of section 3406(a)(1)(c) of the Internal Revenue Code . . . . ☐

CERTIFICATION — Under penalties of perjury, I certify that this information is true, correct and complete.

Signature of New Owner          Date: **December 28 1992**
                           Month     Day     Year

### FOR EQUITABLE/EQUITABLE VARIABLE/EQUITABLE OF COLORADO USE ONLY

The Equitable/Equitable Variable/Equitable of Colorado certifies that this change has been recorded.

Date: **January 13, 19 93**    By: _____

IMPORTANT: Please use typewriter or ball point pen. Press firmly since entries must be legible on both parts. Avoid erasures or alterations. When this page and its duplicate are completed, send both completed copies to us. When we have recorded the change, we will return a copy of the form signed by us as evidence of the change.

IMPORTANT: THIS COPY TO BE RETAINED WITH POLICY.

TOTAL P.02

# PROVISIONS

The words "Insured and Annuitant" and "Policy and Contract" are used interchangeably in this form.

**Beneficiary**

Unless otherwise requested on the reverse side: (a) if two or more persons are named as beneficiaries, those surviving the Insured will share equally; (b) if no stated beneficiary is living when the Insured dies, we will pay the benefits to the children of the Insured who then survive, in equal shares, or if none survive, to the estate of the Insured.

Unless otherwise requested on the reverse side, if the beneficiary designation is on a family type policy, or a policy that includes a Family Plan Insurance Provision, Renewable Term Insurance rider on an Additional Insured, or Children's Term Insurance rider, such designation will apply only to insurance on the life of the Insured.

Unless otherwise provided, installments due after the death of the Insured under an installment type policy or provision will be paid when due to the beneficiaries, if then living, in the order named. A beneficiary who is not a natural person (such as a corporation) or who is a fiduciary will receive payment in one sum.

If a Trustee(s) under a Will is named as beneficiary, and if before payment, the Equitable/Equitable Variable/Equitable of Colorado receives proof satisfactory to it of the admission to probate of a Will creating no such trust, or of the termination of such trust, or of a Will other than the one designated, or of the appointment of a personal representative in intestacy, we will pay the benefits to any succeeding designated beneficiaries if living when payment is due, or should none then be living, to the estate of the last to die of the Insured and the designated beneficiaries.

If any part of the beneficiary change request includes a per stirpes designation, we will pay any benefits under this part equally to the beneficiaries in this designation. However, if any of these beneficiaries dies before the Insured, the deceased beneficiary's share will be paid equally to his or her surviving children. If there are no surviving children, this share will be paid equally to the other surviving beneficiaries to the per stirpes designation.

If the beneficiary designation includes a Deferment (Common Disaster) Period, we will pay the benefits to the beneficiaries in the order named only if living at the expiration of the stated number of days after the death of the Insured. If no designated beneficiary is living after the number of days stated, we will pay the benefits to the children of the Insured who then survive, in equal shares, or if none survive, to the estate of the Insured.

A change of beneficiary shall revoke any previous beneficiary designation or election of a payment option.

**Owner**

The owner can exercise all of the rights in the policy while the Insured is living, without the consent of anyone who has only a conditional or future ownership interest in the policy. The term "Owner" shall mean the person in whom "Policy Rights" are vested. Unless otherwise requested on the reverse side: (a) if two or more persons are named as owners, the policy will be owned jointly or by the survivor; (b) if all persons named as owners die before the Insured, the owner will be the estate of the last such person to die.

An owner who is a minor may not exercise ownership rights except as permitted by law.

This change shall be subject to any assignment in effect and on file with us.

**Correct Tax Basis** — When the ownership of a policy is changed, the Equitable/Equitable Variable/Equitable of Colorado should be furnished with documentation that would allow us to adjust the new owner's cost basis in the policy. These documents could consist of (1) copies of 1099's that were filed by the previous owner, (2) copies of documents showing the PS58 rates that were used each year, (3) photocopies of any checks written by the new owner that were used to purchase the policy from the old owner. Failure to supply the necessary information may subject the new owner to unnecessary tax liability on subsequent financial transactions. (4) If there is a loan on the contract, indicate who received the proceeds.

## Important Notice to New Individual Owner(s) Concerning Taxpayer Identification Number

Beginning January 1, 1984, Federal Law requires payers to generally withhold 20% of taxable interest and certain other payments to payees who are subject to backup withholding. As new owner, you may be the payee of future taxable payments and will be subject to backup withholding if:

    (1)   You fail to furnish your taxpayer identification number to the payee. (For most individual taxpayers, the taxpayer identification number is their social security number.)

    (2)   The Internal Revenue Service notifies the payer that you furnished an incorrect taxpayer identification number.

    (3)   You are notified by the Internal Revenue Service that you are subject to backup withholding under section 3406(a)(1)(c) of the Internal Revenue Code because you underreported interest on dividends or you were required to but failed to file a return which would have included a reportable interest or dividend payment.

    (4)   For an interest or dividend earning policy/contract issued after December 31, 1983, you fail to certify to the payer that you are not subject to backup withholding under (3) above.

If two or more individuals are listed as owners, the taxpayer identification number or social security number of the first owner listed should be provided.

In case of a minor, the minor's social security number must be provided. If the minor does not have a social security number, the natural guardian for the minor owner may obtain one by applying to the social security Administration on Application Form SS-4. If the newly acquired number is not received by Equitable/Equitable Variable/Equitable of Colorado within 60 days, Equitable/Equitable Variable/Equitable of Colorado is required by law to withhold 20% of any taxable interest being credited to the policy/contract.

# EXHIBIT
# D

Fay 667 - 3690
Casting

# THE EQUITABLE
Southern Service Center
CHARLOTTE NC  28259-0001

January 27, 1993

Policy:     84 025 858
Insured:   Mr Richard A Jacoby

```
| NOTICE OF PAYMENT DUE        |     James H Jacoby TR
|                              |     Ua Dtd 921031
| Amount Due:  $8,593.50       |     CO DAVID GLYN ESQ
|                              |     15TH AND CHESTNUT STS
| Date Due:   February 20, 1993|     PHILADELPHIA PA  19102
|                              |
| Details:                     |
| Premium - 12 months  $8,593.50|
|                              |
|                              |
|                              |
|                              |
|_____|
```

The adjustable loan interest rate for the policy year February 20, 1993
to February 19, 1994 is 8.93% .  This rate is guaranteed for the policy
year shown.

This rate is less than the maximum we may charge which is based on
Moody's Bond Index for the month ending two months before the date we
determine our ALIR.  It complies with the state laws where you elected
ALIR.

Remember that, as an Equitable policyowner, you have a lifetime claim on
Equitable service. We are always ready to serve you and will be happy to
help with any questions you may have.

Southern Service Center's Telephone Numbers:
In N. Carolina (704) 362-6200   Other Mainland States: (704) 362-6200

SEE REVERSE SIDE FOR IMPORTANT INFORMATION

RETURN THIS PORTION WITH YOUR PAYMENT                RJ 24028560
    Make your check or money order payable to Equitable Life.
    Be sure to write your Policy Number, 84 025 858, on the check.

| Premium For | AMOUNT DUE BY |
| 12 Months   | Feb. 20, 1993 |
|-------------|---------------|
| $8,593.50   | $8,593.50     |

James H Jacoby TR              EQUITABLE COLLECTION CENTER
Ua Dtd 921031                  SOUTHERN SERVICE CENTER
CO DAVID GLYN ESQ              P.O. BOX 70518
15TH AND CHESTNUT STS          CHARLOTTE NC  28272-0518
PHILADELPHIA PA  19102

10210000212533121H84025858J930220  411804168593S010J

# EXHIBIT
# E

LAW OFFICES

# WOLF, BLOCK, SCHORR AND SOLIS-COHEN

TWELFTH FLOOR PACKARD BUILDING
S.E. CORNER 15TH AND CHESTNUT STREETS
PHILADELPHIA, PA 19102-2678

GREAT VALLEY CORPORATE CENTER
SUITE 300
65 VALLEY STREAM PARKWAY
P.O. BOX 3005
MALVERN, PA 19355-1477
(215) 889-4900
FACSIMILE: (215) 889-4916

305 N FRONT STREET
SUITE 401
HARRISBURG, PA 17101-1236
(717) 237-7160
FACSIMILE: (717) 237-7161

(215) 977-2000
TWX: 710-670-1927
WOLBLORR PHA

FACSIMILE: (215) 977-2346 (8TH FLOOR)
(215) 977-2334 (16TH FLOOR)

DIRECT DIAL NUMBER:

(215) 977-2106

January 29, 1993

PERSONAL AND CONFIDENTIAL

Richard A. Jacoby, Esquire
President
c/o Trilogy Development Co., Inc.
1541 East Strasburg Road
West Chester, PA  19380-6380

        Re:  Insurance Trust

Dear Dick:

        I enclose photocopies of premium notices.

        Unless I hear from you to the contrary, I will arrange
for payment of these statements out of the funds held in the
insurance trust.

        Best regards.

                                Sincerely,

                                David R. Glyn
                For WOLF, BLOCK, SCHORR and SOLIS-COHEN

DRG:lk
Enclosures

DSC:95289.1

# EXHIBIT

# F

# Richard A. Jacoby

2490 White Horse Road

Berwyn, Pennsylvania 19312

February 1, 1993

David R. Glyn, Esquire
Wolf, Block, Schorr & Solis-Cohen
12th Floor Packard Building
15th & Chestnut Streets
Philadelphia, PA   19102-2678

RE:     INSURANCE TRUST

Dear Dave:

    I received  the copies of the two insurance bills sent to me with your
letter dated January 29, 1993.

    The  $382.38  premium on the Phoenix Home Life Mutual Insurance Company
policy #1869517 should be paid by the trust.

    However, the  Equitable  Life  policy  was originally intended to be a
"Vanishing  Premium"  policy, with the last premium paid in February, 1992.
I  have asked Cathy at Howard Silverman's office to check with Equitable to
determine  whether  this  premium notice can be disregarded.  I will be out
of  the  office  until  February 10, at which time we can determine whether
the  policy  is,  in fact, fully paid, or whether arrangements must be made
for additional premium payments.

                              Sincerely,

RAJ/cw

cc:  Howard Silverman

# EXHIBIT

# G

# HSA Corporation

Life Insurance
Executive Compensation
Charitable Funding Programs

Suite 227
One Presidential Boulevard
Bala Cynwyd, PA 19004

(215) 667-1600
Fax. (215) 667-3690

March 18, 1993

<u>PERSONAL AND CONFIDENTIAL</u>

Richard Jacoby
2490 White Horse Road
Berwyn, PA 19312

Re: Equitable policy# 84025858

Dear Richard:

Enclosed is the Equitable Life illustration you requested showing existing dividends being used to pay the premiums.  As you will see from this illustration, this will keep your policy in-force without having to pay any additional premiums.

If you need any additional information, please do not hesitate to contact Howard or myself.

Thank You,

Kathy Krakoski
Service/Underwriting

CC:   David R. Glynn, Esq.

Enclosure

*VALUES ARE BASED ON THE 1993 DIVIDEND SCALE AND CURRENT DIVIDEND OPTION

OPTIONAL PAY PROGRAM - DIVIDENDS TO ADDITIONS
Policy# 84025858

| POLICY YR BEGINNING ON | *ANNUAL OUTLAY | GUARANTEED CASH VALUE | CASH VALUE OF ADDITIONS | #TOTAL CASH VALUE | TOTAL ADDITIONS | #TOTAL DEATH BENEFIT |
|---|---|---|---|---|---|---|
| 02-20-93 | 0 | 79,200 | 21,200 | 100,400 | 43,920 | 493,920 |
| 02-20-94 | 0 | 88,650 | 18,780 | 107,438 | 37,904 | 487,904 |
| 02-20-95 | 0 | 98,100 | 16,884 | 114,988 | 33,183 | 483,183 |
| 02-20-96 | 0 | 107,550 | 15,552 | 124,178 | 29,781 | 480,867 |
| 02-20-97 | 0 | 117,450 | 14,868 | 134,082 | 27,761 | 479,525 |
| 02-20-98 | 0 | 126,900 | 14,558 | 143,296 | 26,519 | 479,057 |
| 02-20-99 | 0 | 136,350 | 14,643 | 154,404 | 26,033 | 479,444 |
| 02-20-00 | 0 | 146,250 | 15,368 | 166,005 | 26,681 | 481,068 |
| 02-20-01 | 0 | 155,700 | 16,812 | 177,962 | 28,526 | 483,975 |
| 02-20-02 | 0 | 165,600 | 19,022 | 191,246 | 31,559 | 488,183 |
| 02-20-03 | 0 | 175,050 | 21,987 | 204,917 | 35,685 | 493,565 |
| 02-20-04 | 0 | 184,500 | 25,757 | 218,570 | 40,957 | 499,299 |
| 02-20-05 | 0 | 193,950 | 30,447 | 233,127 | 47,381 | 506,111 |
| 02-20-06 | 0 | 203,400 | 36,113 | 248,666 | 55,076 | 514,229 |
| 02-20-07 | 0 | 212,400 | 42,845 | 264,803 | 64,085 | 523,643 |
| 02-20-08 | 0 | 221,850 | 50,724 | 282,560 | 74,466 | 534,452 |
| 02-20-09 | 0 | 230,400 | 59,796 | 300,564 | 86,225 | 546,593 |
| 02-20-10 | 0 | 239,400 | 70,142 | 320,315 | 99,405 | 560,178 |
| 02-20-11 | 0 | 247,500 | 81,797 | 340,439 | 114,000 | 575,145 |
| 02-20-12 | 0 | 256,050 | 94,806 | 362,106 | 130,007 | 591,287 |

* PREMIUMS ARE ASSUMED TO BE PAID UP TO THE BEGINNING OF THE FIRST POLICY YEAR
  ILLUSTRATED.

# INCLUDING EXISTING DIVIDEND CREDITS, IF ANY. ALSO INCLUDES
  TERMINATION DIVIDEND, IF ANY (PAYABLE UPON DEATH OR SURRENDER).

# EXHIBIT

# H



COZEN
O'CONNOR

A PROFESSIONAL CORPORATION

1900 MARKET STREET    PHILADELPHIA, PA 19103    215.665.2000    800.523.2900    215.665.2013 FAX    www.cozen.com

March 1, 2013

**David R. Glyn**
Direct Phone  215-665-4117
Direct Fax     215-701-2203
dglyn@cozen.com

The AXA Equitable Life Insurance Company
P.O. Box 1047
Charlotte, NC  28201-1047

Re:    Policy No. 84025858 Issued February 1984

Gentlemen:

We represent Richard A. Jacoby, who is the insured under the above life insurance policy.  We also represent the current owner of the insurance policy, which should be the Richard A. Jacoby Trust dated October 31, 1992.

Would you please advise as to the following:

1.    The mailing address for annual statements and other notices with respect to this insurance policy.  We have not been receiving any statements on this insurance policy.

2.    Please send us a copy of the most recent annual statement for this policy, which would indicate current death benefit and also current cash surrender value.

I appreciate your prompt attention to this matter.

Sincerely,

COZEN O'CONNOR

By:    David R. Glyn

DRG/kd

cc:    Richard A. Jacoby, Esquire

LEGAL\14995356\1 00602.3032.000/236285.000

# EXHIBIT
# I



**AXA EQUITABLE**

**redefining / standards®**

March 22, 2013

David R Glyn
1900 Market St
Philadelphia PA  19103

Policy No:  84 025 858
Insured:    Richard A Jacoby

## [Policy Status

Dear David R Glyn:

Thank you for the opportunity to be the service provider for your insurance needs. We have thoroughly reviewed our records with the information you provided and regret to inform you that the policy terminated effective August 02, 2004 due to Term Expiry.  For this reason, this policy does not have any value.

## What to do next

If you have any questions about this information, please call us at **1-800-777-6510**. Assistance is readily available Monday through Friday during business hours of 8:00 a.m. to 7:00 p.m. (Eastern Time).

Sincerely,
Jennifer Fennema
Policy Service
J/MOK

cc: Financial Professional Warren Goodman Jr, ChFC @ CLU

**THE AXA EQUITABLE LIFE INSURANCE COMPANY**
P.O. BOX 1047, CHARLOTTE, NORTH CAROLINA 28201-1047

# EXHIBIT

# J



May 10, 2013

**David R. Glyn**
Direct Phone   215-665-4117
Direct Fax     215-701-2203
dglyn@cozen.com

**VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED**
**VIA E-MAIL (LIFE-SERVICE@AXA-EQUITABLE.COM)**
**VIA FACSIMILE (855-268-6378)**
**VIA FIRST CLASS MAIL**

Ms. Jennifer Fennema
Policy Service
The AXA Equitable Life Insurance Company
P.O. Box 1047
Charlotte, NC 28201-1047

**Re:    Policy No. 84025858**
**Insured:  Richard A. Jacoby**

Dear Ms. Fennema:

I represent the Trustee of the "Richard A Jacoby Insurance Trust dated October 31, 1992" and I also represent the insured, Richard A. Jacoby.

On behalf of the Trustee, I enclose letter from the Trustee dated May 10, 2013 addressed to you in response to your letter dated March 22, 2013.

Please note that the attached letter requests a response within two weeks from the date of the letter.

Would you please acknowledge receipt of the enclosed letter and return the same to me at Cozen O'Connor, 1900 Market Street, Philadelphia, PA 19103.

Sincerely,

COZEN O'CONNOR

By:    David R. Glyn

DRG:jdd
Enclosures

cc:    James H. Jacoby, Trustee
       Richard A. Jacoby

**JAMES H. JACOBY**
C/o David R. Glyn, Esquire
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103

May 10, 2013.

Ms. Jennifer Fennema
Policy Service
The AXA Equitable Life Insurance Company
P. O. Box 1047
Charlotte, NC 28201-1047

Fax: 855-268-6378
Email: life-service@axa-equitable.com.

Re: Policy No. 84025858

Dear Ms. Fennema:

I am the Trustee of the "Richard A. Jacoby Insurance Trust U/I dated October 31, 1992. On December 28, 1992, there was assigned to me, in my capacity as Trustee, Policy No. 84025858, which had been issued by The Equitable Financial Companies on the life of Richard A. Jacoby. The policy was originally issued on February 20, 1984, with an original death benefit of $450,000 and was designated by the issuing company as a "Whole Life 100" policy.

Premiums were paid annually through February, 1992, after which the policy values were intended to keep the policy in force indefinitely, in accordance with the original "Vanishing Premium" program pursuant to which the policy was issued, and as further evidenced by an illustration supplied by the insurer in 1993. That illustration showed both increasing "Total Death Benefits" and increasing "Guaranteed Cash Value" with zero annual premium outlay, at least through the year 2012 (the last year projected in the illustration).

A letter dated March 22, 2012 from AXA Equitable (not received until approximately a week ago), which was sent in response to an inquiry by the attorney for the Trust that owns the policy, stated that "the policy terminated effective August 02, 2004 due to Term Expiry. For this reason, this policy does not have any value."

Since neither I, nor the attorney for the Trust nor the insured party ever received any notice that any of the policy circumstances have changed, we found this letter to be very alarming.

Accordingly, we urgently request immediate answers to the following questions:

1. Was there ever a notice given to the policy owner or the insured that the policy was going to terminate at some stated time?

2. How can there be a "Term Expiry" of a whole life policy?

3. If there at any time was a conversion of the policy from a whole life policy to a term policy, how could that have been accomplished without (a) notification to any of the interested parties and (b) authorization from the owner of the policy?

4. What were the options available to the policy owner that would, if notice had been properly provided, have prevented the policy from being (a) converted to a term policy and/or (b) terminated?

I look forward to your prompt response.  If we have not received a response within two weeks, we will have no alternative but to consider other steps..  I request that you send copies of future correspondence in this matter to David R. Glyn, Esq., Cozen O'Connor, 1900 Market Street, Philadelphia, PA 19103.

Sincerely,

James H. Jacoby, Trustee under
Indenture of trust of Richard A. Jacoby
Dated October 31, 1992

# EXHIBIT K



05/23/2013

Insured: Richard A
Jacoby

Policy Number:
084025858

☎ 800-777-6510

axa-equitable.com

PRIVATE AND CONFIDENTIAL
David R Glyn, Esq
Cozen O'Connor
1900 Market Street
Philadelphia PA 19103

# Policy Information

Dear David R Glyn,

This letter is in response to the inquiry that we received from
James H Jacoby, Trustee for the above referenced policy.

According to our records, premiums were paid to February 20,
1993.  When no further premiums were received and in
accordance with the terms of the policy, it was placed on the
non-forfeiture option of Paid-Up Extended Term (PUXT)
Insurance.  Under PUXT, the net cash surrender value is used to
purchase term insurance with an expiry date of August 2, 2004.
The length of time that coverage will continue depends on the
net cash surrender value on the default date as the value
decreases daily until it reaches zero on the expiry date. The
policy then terminates without value.

A letter would have been generated in early 1993 advising the
client of the PUXT status and advising that the policy could be
reinstated to a premium paying contract. Please note that our
retention period for this type of document is 10 years and
therefore, we do not have a copy of the letter. AXA Equitable
does not send notice of policy termination when it is on PUXT.

## What to do next

If you have any questions about this information, please call us
at 1-800-777-6510.  Assistance is readily available Monday
through Friday during business hours of 8:00 a.m. to 7:00 p.m.
(Eastern Time).

Sincerely,

Evelin Geister

**AXA EQUITABLE LIFE INSURANCE COMPANY**
**PO BOX 1047, CHARLOTTE, NORTH CAROLINA 28201-1047**

# EXHIBIT
# L



**AXA EQUITABLE**

**redefining / standards®**

**Doreen Smith**
*Senior Associate*
*(704) 341-7021*
*(800) 777-6510*
*Fax: (704) 540-2204*
*doreen.smith@axa-equitable.com*

*Client Relations*

June 28, 2013

David R Glyn
Cozen O'Connor
1900 Market Street
Philadelphia, PA  19103

Re:     Policy Number:     84 025 858
        Insured:           Richard A. Jacoby
        Our File Number:   2036809

Dear Mr. Glyn:

Thank you for your patience while we reviewed the concerns expressed in your correspondence dated June 6, 2013, regarding the above referenced policy. In this letter, you explained that the Trustee, James H. Jacoby, did not authorize AXA Equitable to convert policy 84 025 858 to Paid-Up Extended Term (PUXT) insurance. You also stated that Mr. Jacoby was unaware that coverage terminated on August 2, 2004. You requested documentation reflecting the conversion and termination of coverage.

Our records indicate that policy 84 025 858 was issued as a Whole Life 100 insurance contract with an original face amount of $450,000.00 and a February 20, 1984 register date, insuring the life of Richard A. Jacoby. The policy was issued with an annual premium of $8,593.50. Dividends while not guaranteed purchased additional paid-up insurance. Under its whole life structure, premiums to maintain Mr. Jacoby's coverage, were payable during his lifetime, to age 99.

A specimen policy as issued, including the application for insurance is enclosed for your review. If any anytime a premium was not paid within its standard 31-day grace period, the policy would lapse and written notification would be mailed to the policy owner at the last known address requesting payment. Please refer to Page 4 of the policy that states, **"If a premium is not paid by the end of its grace period, the policy will lapse as of the premium due date. If this occurs, all insurance ends, except as stated in the Options on Lapse section on Page 6".** In accordance with its terms, the policy's cash value would automatically convert coverage to Paid-Up Extended Term (PUXT) insurance. Written notification would be mailed reflecting the PUXT face amount, cash value, and expiration date of coverage. While under PUXT, premium payments would no longer be required and the policy would be continued as paid-up term insurance with coverage expiring on a specific date. The amount of insurance would be equal to the face amount, plus any dividend additions or accumulations and minus any outstanding loan balance as of the premium paid-to-date until the expiry date. The expiry date would be based on the length of time as determined from the net cash value.

Page 2
June 28, 2013
Policy Number 84 025 858
Insured: Richard A. Jacoby

You stated in your letter that in March of 1993, AXA Equitable provided Mr. Jacoby with an illustration, which showed that the policy converted to an **"Option Pay Program"** and that existing dividends were sufficient to pay the insurance premiums. Pursuant to our historical data, when the February 20, 1993, annual premium in the amount of $8,593.50 was not paid within the 31-day grace period, the policy lapsed and a system-generated Notice of Policy Lapse dated **March 20, 1993**, was mailed to the address of record requesting payment. After the premium remained past due 62 days, a second system-generated notice dated **April 23, 1993** was mailed explaining the policy had been automatically converted to PUXT, reflecting the face amount, cash value, and the date coverage would end. Unfortunately, due to the expiration of our standard 7-year document retention period, these notices are no longer available to us. As such, we are unable to provide you with copies.

Pursuant to the terms of the contract, Mr. Jacoby could have reinstated the policy within five years after lapse if: (1) the policy was not given up for its net cash value, (2) Mr. Jacoby provided evidence of insurability satisfactory to us; and (3) Mr. Jacoby paid the requested reinstatement amount plus applicable late fees. Unfortunately, as the policy has lapsed more than five years ago, policy reinstatement is no longer available.

Based on our review, we have determined that policy 84 025 858 performed in accordance with its terms and provisions. When the February 20, 1993 annual premium was not paid, the policy lapsed and was subsequently converted to the PUXT non-forfeiture option. There was no request required from Mr. Jacoby, as this conversion was an automatic product feature. While copies of the associated lapse and conversion notices are no longer available, our files indicate these documents were appropriately mailed to the Trustee, James Jacoby, at the address reflected on the enclosed Change of Owner form, dated December 28, 1992. Under the PUXT, Richard Jacoby was insured for a face amount of $501,159.00 and the Trust was no longer obligated to pay regular premiums. The policy provided paid-up extended term insurance from 1993 until coverage expired effective August 2, 2004. During this time, had death occurred, we would have paid a death benefit to the designated beneficiary (s).

We hope this information provides the explanation you were seeking regarding this matter. If you have any questions concerning this matter, or if we may be of further assistance, please let us know.

Sincerely,

Doreen Smith

Enclosures

# EXHIBIT

# M



FILED

NB J 4

OFFICE OF
INSURANCE REGULATION
Docketed by:

## DEPARTMENT OF FINANCIAL SERVICES
## OFFICE OF INSURANCE REGULATION

TOM GALLAGHER
CHIEF FINANCIAL OFFICER

C1C06

KEVIN M. MCCARTY
DIRECTOR

IN THE MATTER OF:

THE EQUITABLE LIFE ASSURANCE SOCIETY
OF THE UNITED STATES

Case No.  42175

_____/

## CONSENT ORDER

This cause came on for consideration upon the agreement by and between the EQUITABLE

LIFE ASSURANCE SOCIETY OF THE UNITED STATES (hereinafter "EQUITABLE") and

the DEPARTMENT OF FINANCIAL SERVICES, OFFICE OF INSURANCE REGULATION,

(hereinafter referred to as the "AGENCY").  After a complete review of the entire record and

upon consideration thereof, and being otherwise advised in the premises, the AGENCY finds as

follows:

1.        WHEREAS, the AGENCY  ("AGENCY" being understood for purposes of this

Consent Order as including its regulatory predecessor, the Florida Department of Insurance), has

conducted an investigation of The Equitable Life Assurance Society of the United States (NAIC

Company Code 62944), The Equitable of Colorado, Inc. (NAIC Company Code 62880), and

Equitable Variable Life Insurance Company[1] (collectively, "Equitable") regarding their life insurance sales practices during the time period January 1, 1982 through May 31, 2003 (the "Investigation"), as more specifically described below; and

2.     WHEREAS, Equitable is and was at all times relevant hereto licensed by the AGENCY to sell accident and health and life insurance and annuities under the laws of the State of Florida, and the AGENCY has jurisdiction over the subject matters of the Investigation and Equitable; and

3.     WHEREAS, the subject matters of the Investigation were Replacement, Vanishing Premium, and Life Insurance Presented as an Investment, which, for purposes of this Consent Order only, are defined as follows:

A. "Replacement" relates to a sale involving the use of values from a pre-existing Equitable life insurance policy to purchase, in whole or in part, a new life insurance policy;

B. "Vanishing Premium" relates to a sale of a whole life insurance policy in which transaction the policyholder may or may not have received an illustration depicting that, under certain circumstances, out-of-pocket premiums may have been payable for a shorter period than the life of the policy;

C. "Life Insurance Presented as an Investment" relates to a sale of a life insurance policy in which transaction the policyholder may or may not have understood that the sole or primary nature of the product was life insurance; and

---

[1]     As of January 1, 1997, Equitable Variable Life Insurance Company was merged into The Equitable Life Assurance Society of the United States pursuant to Article 71 of the New York Insurance Law.

4.    WHEREAS, Equitable asserts that the subject matters of the Investigation as defined in this Consent Order are broader than the subject matters as defined under Florida law and AGENCY rules and regulations; and

5.    WHEREAS, Equitable denies that it has violated any provision of Florida law or other applicable law or AGENCY rules and regulations, and nothing contained in this Consent Order shall in any way, before any court, tribunal, administrative body or any other entity, be deemed or be used as an admission of liability by Equitable, or of any violation by Equitable of any law, regulation or rule of the State of Florida or of any other federal, state or local governmental entity; and

6.    WHEREAS, Equitable has self-reported to the AGENCY concerning certain of the sales practices investigated, and has fully cooperated with the AGENCY in its Investigation; and

7.    WHEREAS, the Investigation was coordinated with an investigation of the same subject matters conducted by the Florida Department of Legal Affairs (the "Department of Legal Affairs"), which investigation is identified by the Department of Legal Affairs as Investigation L96-3-1020; and

8. WHEREAS, the Department of Legal Affairs and Equitable shall, contemporaneously with the execution of this Consent Order, execute a Settlement Agreement which finally resolves Investigation L96-3-1020 (the "Settlement Agreement"), which Settlement Agreement fully incorporates the terms and conditions of this Consent Order and the Attachment "A" hereto; and

9. WHEREAS, the AGENCY and Equitable have agreed to a settlement of the Investigation as set forth in this Consent Order;

*Consent Order 42175, Page 3*

NOW, therefore, the AGENCY hereby Orders:

A.    Outreach Plan.  In order to resolve all issues relating to and arising out of the Investigation and to provide relief for Florida life insurance policyholders who may have been affected by any of the subject matters of the Investigation, Equitable shall expeditiously implement in Florida the Outreach Plan (the "Outreach Plan") set forth in Attachment "A" hereto, each page of which has been initialed by representatives of Equitable and the AGENCY to authenticate same as an attachment hereto, and which is deemed incorporated into and made a part of this Consent Order.  The cost of the Outreach Plan is to be borne solely by Equitable, and is in addition to the Mandatory Payment required herein.

B.    Mandatory Payment.  Equitable shall make a mandatory payment  in the aggregate of ONE-MILLION SIX-HUNDRED THOUSAND DOLLARS ($1,600,000), covering all costs arising out of or in connection with the Investigation and Dept. No. 42175, as well as all costs arising out of or in connection with Department of Legal Affairs Investigation No. L96-3-1020 and the subject matters investigated therein, $800,000 of which is payable to the Insurance Commissioner's Regulatory Trust Fund and $800,000 of which is to be paid to or as directed by the Florida Department of Legal Affairs in the Settlement Agreement.

C.    General Release.  In consideration of the terms and provisions of this Consent Order, and in regard to the Investigation and the subject matters investigated, the AGENCY hereby releases and forever discharges Equitable and its present and former parent companies, subsidiaries, divisions, affiliates, officers, directors, employees, shareholders, fiduciaries, transferees, attorneys, distributors of any service, dealers, representatives, predecessors, successors, and assigns from any and all liability to the AGENCY for, and from all causes of action, penalties, fines, claims, damages, losses and demands of any nature

whatsoever, civil, criminal, or administrative, whether known or unknown, that might have been

or that might otherwise be asserted by the AGENCY under Florida laws and AGENCY rules and

regulations currently or previously in effect. The General Release provided in this paragraph

does not release or otherwise run in favor of any individual person in their capacity as a licensed

insurance agent appointed by or otherwise acting as a selling insurance agent for (a) Equitable,

or (b) any of the present or former subsidiaries of Equitable.

       D.   Continuing Authority. Notwithstanding the General Release, the

AGENCY shall retain continuing authority to enforce Equitable's compliance with the terms and

provisions of this Consent Order.

       E.   Binding Document. This Consent Order shall be binding on and inure to

the benefit of the AGENCY and Equitable and their respective legal representatives, successors

and assigns.

       F.   Waiver of Hearing. Equitable expressly waives a hearing in this matter,

the making of findings of fact and conclusions of law by the AGENCY, and all other and further

proceedings herein to which Equitable might otherwise be entitled by Florida law or by

AGENCY rules and regulations. Equitable agrees not to appeal or otherwise contest this

Consent Order. This waiver does not extend to, and Equitable expressly reserves its right to a

hearing and all other process due and available by law in any proceeding commenced by the

AGENCY to enforce Equitable's compliance with the terms of this Consent Order as described

herein.

       G.   AGENCY Action. Except as expressly set forth in this Consent Order, the

failure of the AGENCY at any time to require strict performance by Equitable of any of the

terms, provisions or conditions hereof shall in no way affect the AGENCY's right thereafter to

enforce the same, nor shall the waiver by the AGENCY of any breach of any of the terms,

provisions or conditions hereof be construed as or deemed to be a waiver of any succeeding breach of any of the terms, provisions or conditions hereof.

      H.    <u>Choice of Law</u>.  The AGENCY and Equitable agree that the substantive law of Florida shall apply and control for purposes of interpreting, applying and enforcing any provision of this Consent Order.

      DONE and ORDERED this <u>14th</u> day of <u>August</u>, 2003.

 

Tom Gallagher
Chief Financial Officer

Kevin M. McCarty
Director
Office of Insurance Regulation

IN THE MATTER OF:

THE EQUITABLE LIFE ASSURANCE SOCIETY
OF THE UNITED STATES                                     Case No.  42175

_____/

## CONSENT

The Equitable Life Assurance Society of the United States, by and on behalf of itself and The
Equitable of Colorado, Inc.,* and through the signature of its officer below, consents to the entry
and filing of this Consent Order by the Florida Department of Financial Services, Office of
Insurance Regulation, agreeing without reservation to be bound by all of the terms and
conditions of the Consent Order.  The Officer signing below is duly authorized to execute this
Consent Order on behalf of The Equitable Life Assurance Society of the United States and The
Equitable of Colorado, Inc.

The Equitable Life Assurance Society of the United States

By:  _____
     Signature of Officer

     _____
     RICHARD V. SILVER
     Typed Name of Officer

     _____
     EXECUTIVE VICE PRESIDENT + GENERAL COUNSEL
     Title of Officer

     _____
     JULY 30, 2003
     Date Signed

_____
*       As of January 1, 1997, Equitable Variable Life Insurance Company was merged into The
Equitable Life Assurance Society of the United States pursuant to Article 71 of the New York Insurance
Law.

Authenticating Initials and date
For Equitable : _LM_ 7/30/03
For DFS: _DM_ 84-03

ATTACHMENT "A"
Consent Order 42175
Page 1 of 23 pages

# OUTREACH PLAN

1.   **GENERAL PURPOSE OF PLAN** – The complaint matters pertaining to Equitable insurance policies contemplated to be addressed by this Outreach Plan, as more particularly described below, are replacement, vanishing premium and/or life insurance presented as an investment.

   A.   "Replacement" relates to use of values from a pre-existing Equitable life insurance policy to purchase, in whole or in part, a new Equitable life insurance policy.

   B.   "Vanishing Premium" relates to a sale of a whole life insurance policy in which transaction the policyholder may or may not have received an illustration depicting that, under certain circumstances, out-of-pocket premiums may have been payable for a shorter period than the life of the policy.

   C.   "Life Insurance Presented as an Investment" relates to a sale of a life insurance policy in which transaction the policyholder may or may not have understood that the sole or primary nature of the product was life insurance.

2.   **OUTREACH PLAN**

   A.   <u>Replacement Outreach</u> – Equitable will mail a replacement outreach package to all Equitable policyholders who:

      (1)   at the time of the purchase of the policy were Florida residents, <u>and</u>

      (2)   during the period January 1, 1982 through May 31, 2003, purchased any Equitable life insurance policy which remained in force after December 31, 1991, <u>and</u>

      (3)   at the time of the new Equitable insurance policy purchase described in (2), *supra,* already owned any existing Equitable life insurance policy which lapsed or was surrendered during the period 120 days before to 25 months after the register date of the new insurance policy.

Authenticating Initials and date
For Equitable : _RM_ _7_R0/03
For DFS: _DA2_ 8-1-03

B.   <u>Vanishing Premium Outreach</u> – With certain specific exceptions*, Equitable will mail a vanishing premium outreach package to all Equitable policyholders who:

   (1)   at the time of the purchase of the policy were Florida residents, <u>and</u>

   (2)   during the period January 1, 1982 through May 31, 2003, purchased an Equitable whole life insurance policy.

C.   <u>Life Insurance Presented as an Investment Outreach</u> – Equitable will mail a life insurance presented as an investment outreach package to all Equitable policyholders who:

   (1)   at the time of the purchase of the policy were Florida residents, <u>and</u>

   (2)   during the period January 1, 1982 through May 31, 2003, purchased any Equitable life insurance policy (not including single premium policies) which has both an odd face amount (*i.e.*, a face amount <u>not</u> <u>evenly</u> divisible by ten (10)) with no remainder and an even premium amount (*i.e.*, a premium amount <u>evenly</u> divisible by ten (10) with no remainder).

D.   <u>Outreach Packages/Response Letters</u>

   (1)   Equitable will mail on a rolling basis separate Outreach Packages to the respective replacement, vanishing premium and life insurance presented as an investment to eligible policyholder groups, more fully described above.

      (a)   The Outreach Packages mailed to the policyholders will consist of a cover letter from the Chief Financial Officer of the State of Florida (Appendix 2), a letter from an Officer of Equitable (Appendix 1), a summary of the policy values and an enclosed self-addressed, postage-paid policyholder response card.

      (b)   The Outreach Packages will be mailed on a rolling basis by Equitable commencing within 90 days, and completed not later than 180 days, after the date of execution of the Consent Order by the Department.

---

*   Vanishing premium outreach letters will not be mailed by Equitable to those policyholders specified herein who purchased one of the following types of whole life policies:  (a) limited payment policies (*e.g.*, 20 pay life, life paid up at 65, endowment policies), and policies where the non-forfeiture options are in effect (*e.g.*, reduced paid up or extended term policies), (b) group and term conversion policies, (c) policies resulting from the exercise of an option to purchase additional insurance, (d) policies where the current dividend election is not paid up additions, (e) policies currently with an outstanding loan, (f) policies with Economatic dividend provisions, or (g) policies where the Premium Payment Alternative (PPA) or Additional Dividend Option (ADO) was requested by the policyholder.

Authenticating Initials and date
For Equitable : _LB_ 7/30/03
For DFS: _DA3_ 8-1-03

(2)  Response cards or telephone calls from policyholders shall be required to be returned to Equitable no later than 45 days from the date on the notice letters from Equitable.

(3)  Within 14 days of receiving a policyholder response, Equitable will mail to policyholders an acknowledgment letter.  Thereafter, Equitable's customer relations staff will contact each policyholder responding to determine the nature of the inquiry and attempt to address such inquiry.  In the event such inquiry cannot be resolved, Equitable will mail a letter to the policyholder outlining the Outreach Plan and procedures (including those relating to settlement offers, internal appeals, and binding, independent arbitration), and advising the policyholder that a written complaint must be filed within 45 days from the date of Equitable's response materials.  The response materials will further state that a policyholder's failure to timely file a written complaint will permanently bar the policyholder from participating in the outreach process set out herein.

E.  <u>Non-Noticed Complaints</u> – For a period of 9 months from the date the Consent Order is executed by the Department in this matter, any complaint received by Equitable not in response to the outreach mailings, but as to which Equitable determines there is reasonable evidence of a replacement, vanishing premium and/or life insurance presented as an investment relating to an Equitable policy purchased during the period January 1, 1982 to May 31, 2003 by a current Florida resident, shall be processed in the same fashion as those complaints received from policyholders noticed pursuant to the Outreach Plan herein.

F.  <u>Ineligible Complainants</u> – All Florida policyholders determined to be ineligible under this Outreach Plan who purchased Equitable policies, whether or not currently in force, shall nonetheless have their complaints processed pursuant to Equitable's usual and customary complaint processing guidelines, procedures and practices.

## 3.  COMPLAINT REVIEW AND PROCESSING

A.  <u>Internal Review</u>

(1)  Equitable, after initial review and evaluation of an eligible complaint, shall state in writing to the complainant either that a specific settlement offer is being made by Equitable, or that Equitable will make no settlement offer and the reasons therefor.

(2)  If a settlement offer is rejected by a complainant or no settlement offer is made to a complainant, Equitable shall notify the complainant that he/she is entitled to pursue his/her complaint in arbitration and mail the complainant an Arbitration Agreement substantially in the form attached

Authenticating Initials and date
For Equitable : *[initials]* 7/20/03
For DFS: *[initials]* 8-1-03

hereto at Appendix 6 which may be executed and returned to Equitable for binding arbitration.

(3) Any policyholder who accepts any offer of settlement from Equitable (whether as a result of the initial complaint review process or an internal appeal) shall, as a condition thereof, be required to execute a General Release in favor of Equitable on those insurance policies subject to review, with such General Release in substantially the form attached hereto at Appendix 5.

B.     Independent External Arbitration

(1)     A binding arbitration process will be implemented and coordinated by an independent arbitration coordinator mutually selected by Equitable and the Department. Individual arbitrators who have no previous nor current association or affiliation of any kind with Equitable will be selected and assigned by the arbitration coordinator. The arbitration coordinator will act as liaison between the arbitrators and Equitable.

(2)     Equitable shall pay all fees and costs of the arbitrator coordinator and assigned arbitrators, and neither the complainants nor the Department shall be liable for any such fees and costs.

(3)     Complainants shall bear their own fees and costs associated with their participation in the arbitration process, including any fees and costs for legal representation, and Equitable shall not be liable for any such fees or costs.

(4)     As a condition to participating in binding arbitration, complainants will be required to agree to execute a General Release in favor of Equitable on those insurance policies subject to arbitration (see Appendix 5).

(5)     The binding arbitration shall be conducted on a *de novo* basis and without reference to any prior settlement offer or award. Settlement offers made by Equitable and rejected by a complainant shall not constitute a floor amount for arbitration purposes.

(6)     As each party may elect, the binding arbitration will be in person, by telephone, and/or by written submissions. Reasonable efforts shall be made by the Arbitration Coordinator to conduct any in-person arbitrations at a location in one of the following cities: Tallahassee, Jacksonville, Gainesville, Orlando, West Palm Beach, Miami, Cape Coral/Ft. Meyers, Tampa/St. Petersburg, or Pensacola, whichever is closest to the complainant's residence or place of employment in Florida or whichever the complainant decides. If the complainant does not reside in Florida, the arbitration will occur by telephone and/or by written submission.

Authenticating Initials and date
For Equitable : _R&t 7/30/03_
For DFS: _DAS 8-1-03_

(7)     An arbitrator shall determine whether the transaction involved a misrepresentation or omission of any material aspect of those insurance policy issues solely related to replacement, vanishing premium and/or life insurance presented as an investment, based upon consideration of all the evidence and surrounding circumstances.

(8)     Where an arbitrator rules in favor of the complainant, the arbitrator shall award such relief related to replacement, vanishing premium and/or life insurance presented as an investment to the complainant as the arbitrator determines appropriate. Such appropriate relief includes, but is not limited to, directing Equitable to reverse policy transactions, restore policy values, reinstate policies, terminate policies, honor specific vanish representations, make refunds to complainants with interest on any amounts of money paid into a policy, or make cash payments into policies (or award any combination thereof). However, arbitrators may not award to complainants punitive damages and non-financial damages, such as emotional distress or consequential damages, nor may arbitrators award relief of any kind to Equitable.

(9)     All individuals participating in the arbitration shall be required to treat the entire proceeding, including any documents presented, testimony provided and the scope of the ruling issued by the arbitrator, in accordance with the terms of the Arbitration Agreement attached hereto as Appendix 6.

**4.**     **AGENT CONTACT** – Equitable shall instruct its sales agents and management that, until the Outreach Plan is fully completed, no information, advice, comment or suggestions of any kind may be given to a complainant concerning the subject matter of a complaint - - even if solicited from a complainant. The sales agents and management shall instead advise the complainant that, under the Outreach Plan, the complainant must direct such inquiries to the centralized Equitable customer service staff.

**5.**     **RECORDS** – Equitable shall create and maintain all records necessary to document its compliance with this Outreach Plan, and shall maintain such records for at least three years after completion of the Outreach Plan. The records created and maintained by Equitable shall include, but are not necessarily limited to, those described in Appendix 3, attached hereto. All records created and maintained by Equitable pursuant to this paragraph shall be available for inspection by the Departments of Financial Services and Legal Affairs upon reasonable notice to Equitable.

**6.**     **REPORTS** – Equitable shall provide those written reports listed in Appendix 4, attached hereto, to the Department every three months during the entire course of the Outreach Plan.

**7.**     **SUPERVISION** – The agencies shall supervise the implementation of the Outreach Plan by reasonable examination, pursuant to § 624.3161, Fla. Stat.

Authenticating Initials and date
For Equitable : _<u>fut 7/10/03</u>_
For DFS: _DAS 8-1-03_

8. **PUBLICITY** – Prior to the execution of the Consent Order, the Department will provide any press release relating to the Consent Order, and attached Outreach Plan, to Equitable and permit Equitable a reasonable time to review the press release for possible factual errors prior to its release.

9. **RESOLUTION OF ISSUES DURING OUTREACH PLAN** – The Department and Equitable each agree that they shall bring to the attention of the other issues of concern that may arise during the course of the Outreach Plan, and shall attempt in good faith to reach a mutually agreeable resolution regarding those issues.

## APPENDIX 1

## EQUITABLE OUTREACH LETTERS

**Replacement Outreach Letter**

[Date] [*date to be within 2 days of actual mailing*]

Dear Policyowner:

     We are taking this opportunity to contact certain Equitable customers who currently own or may have owned life insurance policies and to provide them with a current summary of policy values, where applicable.

     Our records indicate that at least one of your policies was purchased shortly before or after a transaction involving another Equitable policy, such as a lapse, surrender, or cancellation. Often this indicates that values in an existing policy were used to help pay for an upgraded or new policy.

     We call this to your attention now because some customers who may have been replacing or augmenting an existing policy may not have received certain supplementary information. That information included a notice of replacement. Whether you should have received this information when you applied for a new policy depends on the particular facts and circumstances of your purchase.

     Additionally, the enclosed summary of policy values is intended to provide you with essential policy information and to confirm the status of your Equitable life insurance policies. We encourage you to review this summary and make sure that it agrees with your understanding and your records. We shall be glad to provide you with more specific information regarding your policies or to address any concerns or questions regarding the presentation, purchase, or performance of your policies.

     If you have any concerns, it is important that you contact Equitable within 45 days of the date of this letter, by either returning to us the enclosed postage paid response card or, if it is more convenient for you, feel free to contact me or the Customer Relations Office toll free at 1-___-___-____, Monday through Friday from 9:00 a.m. to 5:00 p.m., EST. We shall be happy to assist you.

     We hope this information is helpful to you and look forward to being of continuing service to you in the future.

                 Sincerely,

                 [Authorized Officer]

Authenticating Initials and date
For Equitable : _ℓ𝓌 7/3₁/03_
For DFS: _ᴅᴀS 8-1-03_

**Vanishing Premium Outreach Letter**

[Date] [*date to be within 2 days of actual mailing*]

Dear Policyowner:

     We are taking this opportunity to contact certain Equitable customers who own whole life insurance policies and to provide them with a current summary of policy values.

     Our records indicate that some customers with whole life insurance policies similar to yours may have been presented with an optional or limited premium payment method when they purchased their policies.  Pursuant to standard policy contract provisions, premiums for whole life insurance policies are due and payable for the lifetime of the policy.  In certain cases, however, an optional or limited premium payment method may allow you to continue paying required premiums without out-of-pocket outlay by using additional funds built up in the policy with past, current, and future dividends, if sufficient.

     Since changes in the dividend scales cause dividend values to fluctuate, a decline in the dividend scales may necessitate more out-of-pocket premium outlay than what may have been presented at the time you purchased your policies.  Conversely, an increase in the dividend scale may reduce out-of-pocket premium outlay and/or increase benefits.

     Whether or not an optional or limited premium payment method was presented to you, the enclosed summary of policy values is intended to provide you with essential policy information and to confirm the status of your Equitable whole life insurance. We encourage you to review this summary and make sure that it agrees with your understanding and your records. We shall be glad to provide you with more specific information regarding your policies or to address any concerns or questions regarding the presentation, purchase, or dividend performance of your policies.

     If you have any concerns, it is important that you contact Equitable within 45 days of the date of this letter, by either returning to us the enclosed postage paid response card or, if it is more convenient for you, feel free to contact me or the Customer Relations Office toll free at 1- __ - __ - ___, Monday through Friday from 9:00 a.m. to 5:00 p.m., EST.  We shall be happy to assist you.

     We hope this information is helpful to you and look forward to being of continuing service to you in the future.

                  Sincerely,


                  [Authorized Officer]

Authenticating Initials and date
For Equitable : *lils* 7/10/03
For DFS: DA2 8-1-03

**Life Insurance Presented as an Investment Outreach Letter**

[Date] [*date to be within 2 days of actual mailing*]

Dear Policyowner:

We are taking this opportunity to contact certain Equitable customers who own life insurance policies and to provide them with a current summary of policy values.

We are doing so in an abundance of caution as part of our efforts to make sure that you understand that the product that you own is a life insurance policy. It is possible that a very small number of policyholders may have thought they were purchasing only a retirement plan or other type of investment and not a life insurance policy.

The enclosed summary of policy values is intended to provide you with essential policy information and to confirm the status of your Equitable life insurance policies. We encourage you to review this summary and make sure that it agrees with your understanding and your records. We shall be glad to provide you with more specific information regarding your policies or to address any concerns or questions regarding the presentation, purchase, or performance of your policies.

If you have any concerns, it is important that you contact Equitable within 45 days of the date of this letter, by either returning to us the enclosed postage paid response card or, if it is more convenient for you, feel free to contact me or the Customer Relations Office toll free at 1-___-___-____, Monday through Friday from 9:00 a.m. to 5:00 p.m., EST. We shall be happy to assist you.

We hope this information is helpful to you and look forward to being of continuing service to you in the future.

Sincerely,


[Authorized Officer]

Authenticating Initials and date
For Equitable : *Rw Jhohu*
For DFS: DAS 8-1-03

## APPENDIX 2

## DEPARTMENT COVER LETTERS

**Replacement Cover Letter**

Appropriate State Agency Letterhead
[dated with same date as corresponding Equitable Outreach Letter in Appendix 1]

Dear Consumer:

I am writing to you about your insurance policy(s) with The Equitable Life Assurance Society of the United States. I am urging you to read carefully the enclosed documents regarding your policy(s) and to consider the information provided.

It appears from information developed in a joint investigation of the Florida Department of Insurance and the Florida Department of Legal Affairs that during the time period January 1, 1982 to May 31, 2003, some Equitable policyholders, including you, lapsed, surrendered, or borrowed cash values from their existing Equitable life insurance policies at or around the same time they purchased one or more new Equitable life insurance policies. Some of those policyholders may have misunderstood that the purchase of their new policy would or might affect their existing Equitable life insurance policy or policies.

For your protection, Florida insurance law requires agents and brokers to have you read and sign a "replacement notice" in many such transactions. This requirement is designed to protect policyholders from deceptive sales practices, including one called "churning," in which customers are promised a new policy at little or no cost, while actually paying for it with values from an existing policy.

Equitable has a responsibility for assuring that its agents and representatives comply with all applicable requirements under Florida law. Therefore, the Company is taking steps to ensure that you understand your policies. Where it can be demonstrated that the Company did not comply with all applicable requirements, the Company has agreed to take certain steps in an effort to rectify the situation. This is why you have been sent the enclosed materials from Equitable. **The fact that you are receiving this letter does not necessarily mean that you should have received a replacement notice or that you were the victim of any improper sales practice.**

For more information about what "replacement" and "churning" are, feel free to call our Consumer Services Division, at 1-800 ___. [*use dedicated number that goes to specially selected consumer service staff*]

Authenticating Initials and date
For Equitable : _LK_ 7/8/03
For DFS: _DM_ 8-1-03

If after reviewing the enclosed materials, you believe your policies were subject to churning, it is important that you contact Equitable within 45 days of receipt of this letter, preferably by returning the enclosed postcard, although you can also call Equitable at 1-800-

Sincerely,

Tom Gallagher

Authenticating Initials and date
For Equitable : _ℳ_ 7/10/03
For DFS: DAS 8-1-03

**Vanishing Premium Cover Letter**

Appropriate State Agency Letterhead
[dated with same date as corresponding Equitable Outreach Letter in Appendix 1]

Dear Consumer:

I am writing to you about your whole life insurance policy(s) with The Equitable Life Assurance Society of the United States. I am urging you to read carefully the enclosed documents regarding your policy(s) and to consider the information provided.

It appears from information developed in a joint investigation of the Florida Department of Insurance and the Florida Department of Legal Affairs that during the time period January 1, 1982 to May 31, 2003, some whole life insurance policyholders of Equitable may have purchased Equitable life insurance policies with a misunderstanding as to how long they would have to pay premium payments. Some policyholders might have thought that they would only have to pay premiums out of pocket for some specified period of time, and then such type of premium payments would end or "vanish," but in fact, the out of pocket premium payments have not ended or did not end.

Equitable has a responsibility for assuring that its agents and representatives comply with all applicable requirements under Florida law. Therefore, the Company is taking steps to ensure that you understand your policies. Where it can be demonstrated that it did not comply with all applicable requirements, the Company has agreed to take certain steps in an effort to rectify the situation. This is why you have been sent the enclosed materials from Equitable. **The fact that you are receiving this letter does not necessarily mean that you were the victim of any improper sales practice.**

For more information about the "vanishing premium" issue, feel free to call our Consumer Services Division, at 1-800 __. [*use dedicated number that goes to specially selected consumer service staff*]

If after reviewing the attached materials, you believe you were misled as to how long premiums would have to be paid on your Equitable policy, it is important that you contact Equitable within 45 days of receipt of this letter, preferably by returning the enclosed postcard, although you can also call Equitable at 1-800-____.

Sincerely,

Tom Gallagher

*Attch "A" to Consent Order 42175, Page 12*

Authenticating Initials and date
For Equitable : _____ 7/30/03
For DFS: DAS 8-1-03

**Life Insurance Presented as an Investment Cover Letter**

Appropriate State Agency Letterhead
[dated with same date as corresponding Equitable Outreach Letter in Appendix 1]

Dear Consumer:

    I am writing to you about your insurance policy(s) with The Equitable Life Assurance Society of the United States. I am urging you to read carefully the enclosed documents regarding your policy(s) and to consider the information provided.

    It appears possible from information developed in a joint investigation of the Florida Department of Insurance and the Florida Department of Legal Affairs that during the time period January 1, 1982 through May 31, 2003, a very small number of Equitable policyholders may have misunderstood the nature of the product they were purchasing.  For example, they may have thought that they were buying <u>solely</u> a retirement plan or college education plan or other type of investment, when in fact they were purchasing a life insurance policy.

    Equitable has a responsibility for assuring that its agents and representatives comply with all applicable requirements under Florida law.  Therefore, the Company is taking steps to ensure that you understand that you own a life insurance policy.  Where it can be demonstrated that the Company did not comply with all applicable requirements, to take certain steps in an effort to rectify the situation.  This is why you have been sent the enclosed materials from Equitable. **The fact that you are receiving this letter does <u>not</u> necessarily mean that you were the victim of any improper sales practice.**

    For more information about the difference between life insurance and "investments" and other "plans," feel free to call our Consumer Services Division, at 1-800 ___. [*use dedicated number that goes to specially selected consumer service staff*]

    If after reviewing the attached materials, you believe you were misled about the nature of the product you purchased, it is important that you contact Equitable within 45 days of receipt of this letter, preferably by returning the enclosed postcard, although you can also call Equitable at 1-800-____.

Sincerely,

Tom Gallagher

*Attch "A" to Consent Order 42175, Page 13*

Authenticating Initials and date
For Equitable : _Wk_ 7/8/03
For DFS: DAS 8-1-03

## APPENDIX 3

## RECORDS

Equitable shall create and maintain all records necessary to document its compliance with this Outreach Plan, and shall maintain such records for at least three years after completion of the Outreach Plan.  Records which Equitable shall thus create and maintain shall include, but are not necessarily limited to, the following:

- a listing identifying all persons sent notice letters and indicating which of those persons subsequently submitted a notice letter complaint, and indicating in regard to each such complaint whether or not Equitable determined it to be an eligible complaint;

- a listing identifying all non-notice letter complaints, the date of the complaint, determined by Equitable to be eligible complaints, and indicating further in regard to each such eligible complaint those in regard to which after being contacted by Equitable for the purpose of ascertaining if complainant desired to have their complaint processed under the Outreach Plan, either declined, or did not timely respond;

- originals of all eligible complaints, and all correspondence and records of communication between (as applicable) Equitable, the complainant, the arbitration coordinator, and the arbitrator, regarding the complaint;

- a listing identifying all complainants and complaints requesting processing under the Outreach Plan and the date of the complaint, and which complaints were denied processing under the Outreach Plan by Equitable on grounds the complaints were not eligible complaints.  Equitable shall keep such complaints and related correspondence; and

- a listing identifying all eligible complaints as to which initial internal review and evaluation was begun, showing for each complaint (as applicable):  whether Equitable made any settlement offer during its initial review, whether it was accepted; whether the complainant requested arbitration; date referred to the arbitration coordinator for arbitration; whether the matter was settled after execution of an arbitration agreement; date the arbitration was received by Equitable; whether the arbitration decision was for Equitable or for the complainant; and date the relief award was implemented by Equitable.

All listings shall be in, or importable into, Access or Excel format.

For purposes of allowing the Department to verify by sampling that non-notice letter Complaints have been appropriately reviewed by Equitable and eligible complaints identified and properly processed, Equitable shall assure that a listing of all non-notice letter complaints it receives on any and all subjects currently tracked by Equitable during the period commencing with the date the Consent Order is executed by the Department and for 9 months thereafter, can be reviewed and sampled by the Department from time-to-time by the Department using one comprehensive list.

Authenticating Initials and date
For Equitable : _RWK_ 7/22/03
For DFS: _DAS 8-1-03_

## APPENDIX 4

## REPORTS

Within 30 days after the end of each calendar quarter commencing March 31, 2003, Equitable shall provide the following written reports in writing to the Department during the implementation of the Outreach Plan (all information shall be cumulative from the inception of the Outreach Plan through the end of the most recent calendar quarter):

- total number of Replacement notice letters mailed
    * total number of Replacement notice letters returned undelivered
    * total number of Replacement notice letters re-mailed to a new address


- total number of Vanishing Premium notice letters mailed
    * total number of Vanishing Premium notice letters returned undelivered
    * total number of Vanishing Premium notice letters re-mailed to a new address


- total number of "Investment" notice letters mailed
    * total number of "Investment" notice letters returned undelivered
    * total number of "Investment" notice letters re-mailed to a new address


- total number of eligible complaints received

- total number of eligible complaints received which are notice letter complaints

- total number of eligible complaints received which are non-notice letter complaints

- total number of notice letter complaints determined by Equitable not to be eligible complaints

- total number of non-notice letter complaints determined by Equitable to apparently be eligible complaints, but as to which the complainant either (i) declined processing under the Outreach Plan or (ii) did not timely respond to request by Equitable for notice as to whether complainant desired to have the complaint processed under the Outreach Plan

- total number of complaints entered into initial review and processing

- total number of complaints in which Equitable has made a settlement offer after initial internal review

- total number of complaints in which an Equitable settlement offer after initial review has been accepted

- total number of complaints in which Equitable has determined to make no settlement offer after initial internal review

- total number of complaints as to which processing under an initial internal review has been completed

Authenticating Initials and date
For Equitable : _MA 7/30/03_
For DFS: _DAS 8-1-03_

- total number of complainants to whom an arbitration agreement has been sent for execution

- total number of arbitration agreements executed and returned to Equitable

- total number of arbitration agreements referred to the arbitration coordinator for arbitration

- total number of arbitrations completed

- total number of arbitrations completed in which the arbitrator has ruled for Equitable

- total number of arbitrations completed in which the arbitrator has ruled for complainant

- total number of arbitration rulings returned by Equitable to the arbitrator for clarification or suggested revision

- total number of arbitrations terminated due to settlement between Equitable and complainant during the arbitration

- total number of arbitrations occurring in each of the following modes: in person; by telephone; and in writing

**Report on Completion**. Equitable shall advise the Department in writing within 30 days of the date on which Equitable deems itself to have finished processing all eligible complaints under the Outreach Plan.

**Final Report**. Within 90 days of Equitable's notice to the Department of Equitable's completion of its obligations under the Outreach Plan, Equitable shall provide the Department with a report identified as the "Final Report", as follows:

- total number of Replacement notice letters mailed, final total number
    * total number of Replacement notice letters undelivered, final total number
    * total number of Replacement notice letters re-mailed to a new address, final total number

- total number of Vanishing Premium notice letters mailed, final total number
    * total number of Vanishing Premium notice letters returned undelivered, final total number
    * total number of Vanishing Premium notice letters re-mailed to a new address, final total number

- total number of "Investment" notice letters mailed, final total number
    * total number of "Investment" notice letters returned undelivered, final total number
    * total number of "Investment" notice letters re-mailed to a new address, final total number

- total number of eligible complaints received, final total number

- total number of eligible complaints received which are notice letter complaints, final total number

- total number of eligible complaints received which are non-notice letter complaints, final

Authenticating Initials and date
For Equitable : _*Rt* 7/30/0?_
For DFS: _DAS  8-1-03_

total number

- total number of letter complaints determined by Equitable not to be eligible complaints, final total number

- total number of non-notice letter complaints determined by Equitable to apparently be eligible complaints, but as to which the complainant either (i) declined processing under the Outreach Plan or (ii) did not timely respond to the request by Equitable for notice as to whether complainant desired to have the complaint processed under the Outreach Plan, final total number

- total number of complaints who entered into the initial internal review process, final total number

- total number of complaints in which Equitable made a settlement offer during the initial internal review process, final total number

- total number of complaints in which an Equitable settlement offer made during the initial internal review process was accepted by complainant, final total number

- total number of complaints in which Equitable determined to make no settlement offer during the initial internal review process, final total number

- total number of complaints as to which processing under the initial internal review process was completed, final total number

- total number of complainants to whom an arbitration agreement was sent for execution, final total number

- total number of arbitration agreements executed and returned to Equitable, final total number

- total number of arbitration agreements referred to the arbitration coordinator for arbitration, final total number

- total number of arbitrations completed, final total number

- total number of arbitrations completed in which arbitrator ruled for Equitable, final total number

- total number of arbitrations completed in which the arbitrator has ruled for complainant, final total number

- total number of arbitration rulings returned by Equitable to the arbitrator for clarification or suggested revision, final total number

- total number of arbitrations terminated due to settlement between Equitable and complainant during arbitration, final total number

- total number of arbitrations occurring in each of the following modes:  in person; by telephone; in writing.

- total cost to Equitable, arbitrators fees and costs

- total cost to Equitable, arbitration coordinator fees and costs

Authenticating Initials and date
For Equitable : _AWr 7/30/03_
For DFS: _DAS  8-1-03_

- total cost to Equitable, relief provided in the Outreach Plan, aggregate initial internal reviews and arbitrations, including settlements and arbitrator awards (see note 1 below)

- total value of relief provided in the Outreach Plan, aggregate initial reviews and arbitrations, including settlements and arbitrator awards (see note 1 below)

- total cost to Equitable, relief provided under initial internal review settlements (see note 1 below)

- total value of relief provided under initial review settlements (see note 1 below)

- total cost to Equitable, relief provided pursuant to arbitrator awards (see note 1 below)

- total value of relief provided pursuant to arbitrator awards (see note 1 below)

- total cost to Equitable, relief provided under initial internal review settlements (see note 1 below)

- total value of relief provided under arbitration settlements (see note 1 below)

Note 1:    Equitable shall provide any explanation necessary to properly understand the data provided, and any assumptions used.  The data provided shall include a breakout of relief in at least each of the following two categories: relief in the form of cash paid-out to complainants; all other forms of relief.

The information provided in any Report or the Final Report shall be used by the Department solely for purposes of assuring performance by Equitable of its obligations under the Consent Order.

Authenticating Initials and date
For Equitable : _ℳ𝒷_ 7/30/03
For DFS: DA? 8-1-03

## APPENDIX 5

## GENERAL RELEASE

This SETTLEMENT AGREEMENT AND GENERAL RELEASE ("Agreement and Release")
is made and entered into by and between:

**The Parties**. [Place Policyowner's Name Here] and THE EQUITABLE LIFE ASSURANCE
SOCIETY OF THE UNITED STATES, EQUITABLE VARIABLE LIFE INSURANCE
COMPANY, and THE EQUITABLE OF COLORADO, INC., (collectively, "EQUITABLE
LIFE").

**Settlement Agreement**.  The purpose of this Agreement and Release is to finally resolve and
settle any and all disputes between and among the parties in connection with claims relating to
policy number[s] _____ (Identify policies at issue in Step 1 Review or Step 2 Arbitration)
[insuring and] owned by [Place Policyowner's Name Here].

In connection with this Agreement and Release, the parties hereby agree as follows:

**EQUITABLE LIFE** shall:

[Place Here What Equitable Life Agrees To Do Under Terms of Settlement or Arbitration
Ruling].

**[Place Policyowner's Name Here]**, in consideration of the foregoing and for other good and
valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and on
behalf of myself and my representatives, successors, heirs and assigns, shall:

[Place Here What Policyowner Agrees To Do Under Terms of Settlement or Arbitration Ruling];
and

Release EQUITABLE LIFE, its present and former parents, subsidiaries, affiliates, divisions,
directors, officers, managers, employees, insurers, shareholders, fiduciaries, distributors,
attorneys, dealers, transferees, representatives, agents, associates, predecessors, successors, and
assigns from any and all liability arising out of or with respect to any and all claims made or
which could have been made relating to policy number[s] (Identify policies at issue in Step 1
Review or Step 2 Arbitration) including, but not limited to, its solicitation, purchase, issuance,
servicing, and performance.

**Entire Agreement**.  This Agreement and Release constitutes the entire agreement between the
parties.  It is understood and agreed that no changes, additions or modifications to this
Agreement and Release may be made by either party unless such changes, additions or
modifications are reduced to writing and consented to by each of the parties, or successor(s) in
interest of the parties with full authority to act on behalf of such party.  The parties expressly

Authenticating Initials and date
For Equitable : *flat 7/30/03*
For DFS: *DAS 8-1-03*

disclaim reliance on any facts or representations made by others if not contained in this Agreement and Release.

**No Admission**.  This Agreement and Release is not an admission of liability on the part of EQUITABLE LIFE or any of its representatives.

**Confidentiality:**  [Policyowner] and Equitable Life each represents and warrants that this Agreement is and shall forever remain confidential and shall not be disclosed to any third party except upon legal process or pursuant to regulatory requirement, and upon the prior written consent of Equitable.  Notwithstanding the foregoing, however, the fact of settlement may be disclosed, and Equitable may make disclosures appropriate in light of legal, financial and reporting obligations.

**Knowing and Voluntary**. **I HAVE CAREFULLY READ THIS CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE AND I FULLY UNDERSTAND ITS TERMS AND PROVISIONS AND SIGN THE SAME VOLUNTARILY.**

**THIS IS A RELEASE**                **READ BEFORE SIGNING**

_____            _____
**Date**                           **[Place Owner's Name Here], Policyowner**

                                   _____
                                   **[Place Officer Name and Title Here]**

STATE OF _____           )
                              ss:  )
COUNTY OF _____          )

       I, _____, a Notary Public of said State and County, do hereby certify that [NAME OF COMPLAINANT], whose name is affixed to the foregoing writing, *Settlement Agreement and General Release*, has this day acknowledged that he signed the foregoing knowingly and of his own free will.

       Given under my hand this _____ day of _____, 200___.


       My commission expires: _____.


                                   _____
                                   Notary Public

Authenticating Initials and date
For Equitable : _AW 7/30/03_
For DFS: _DAS '87-03_

## APPENDIX 6

## ARBITRATION AGREEMENT

**THIS ARBITRATION AGREEMENT** ("Agreement") is made as of the Effective Date by and between each party identified below.

"Complainant" shall mean _____

"Equitable" shall mean The Equitable Life Assurance Society of the United States, The Equitable of Colorado, Inc., and Equitable Variable Life Insurance Company, and their present and former parent companies, subsidiaries, divisions, affiliates, officers, directors, employees, shareholders, fiduciaries, transferees, attorneys, distributors of any service, dealers, representatives, agents, associates, predecessors, successors, and assigns.

Collectively, the Complainant and Equitable shall be referred to herein as the "Parties."

WHEREAS, the Parties wish to resolve any and all disputes concerning the Subject Matter, as defined herein, through final and binding arbitration.

NOW, THEREFORE, in consideration of the mutual benefits and the covenants and agreements contained herein, the Parties hereby agree as follows:

Section 1 – Effective Date.  The term "Effective Date" shall mean the first date by which the Parties have signed this Agreement.

Section 2 – Subject Matter.  The term "Subject Matter" shall mean the following subject matter:

_____
_____          <<<<< Define the Complaint here
_____

Section 3 – Arbitration.  Any dispute, claim, or controversy arising out of or relating to the Subject Matter shall be finally settled and resolved by Arbitration, administered by the Arbitration Coordinator selected pursuant to the Outreach Plan implemented by consent between the Florida Department of Financial Services and Equitable, and conducted in accordance with applicable arbitration guidelines using an Arbitrator in Florida.  Judgment on the award rendered by the Arbitrator(s) maybe entered in any court having jurisdiction thereof.  In particular, the Parties expressly acknowledge and agree that they are knowingly and voluntarily giving up the right to sue each other or another associated person or entity in court, including the right to a trial by jury.  The Complainant further expressly acknowledges that he or she is knowingly and voluntarily giving up any right he or she may have to recover punitive damages and/or compensation for non-financial losses such as emotional distress and consequential or special damages.

Authenticating Initials and date
For Equitable : _RB 7/9/03_
For DFS: _DBS 8-1-03_

Section 4 – General Release.  By executing this Agreement, the Complainant expressly acknowledges and agrees that, once a final and binding ruling has been issued by an Arbitrator with respect to the Subject Matter (the "Ruling"), the Complainant shall execute and return to the Arbitration Coordinator a Confidential General Release in favor of Equitable which incorporates the terms and conditions of the Ruling, such Confidential General Release to be in the form annexed hereto as Exhibit 1.  The Complainant shall return the executed Confidential General Release to the Arbitration Coordinator within 45 days of the date of the notice of the Ruling.  If the Complainant refuses to execute the Confidential General Release voluntarily, Equitable shall be entitled to, and the Complainant consents to the entry of, mandatory injunctive relief in any court of competent jurisdiction compelling execution of a Confidential General Release in favor of Equitable as provided herein.  If the Complainant refuses to execute a Confidential General Release voluntarily, and Equitable is required to file suit to enforce this provision of the Agreement, Equitable shall be entitled to recover its reasonable attorneys' fees and any costs associated with such proceeding.

Section 5 – Confidentiality.  The Complainant, counsel (if any), the Arbitrator and any other participant, expert or otherwise, shall treat as confidential the entire Arbitration, including but not limited to the amount of any relief that may be awarded, and they shall not disclose any documents or information relating to the Arbitration to any third party except on legal process or regulatory requirement, and upon prior written consent of Equitable.

Section 6 – Entire Agreement.  This Agreement contains the entire understanding of the Parties and supersedes all previous verbal and written agreements or representations between the Parties concerning the matters set forth herein.

Section 7 – Amendments.  Alterations, modifications or amendments of a provision of this Agreement shall not be binding unless such alteration, modification or amendment is in writing and signed by an authorized representative of each Party and the Arbitration Coordinator.

Section 8 – Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be an original, but which together shall constitute one and the same instrument.

Section 9 – Governing Law.  This Agreement is governed by the laws of the State of Florida and venue shall be in any court of competent jurisdiction in the State of Florida.

Section 10 – Certification.  The Complainant certifies that he or she has read and understands this Agreement.

Authenticating Initials and date
For Equitable : _fws_ 7/30/03
For DFS: _DAS_ 8-1-03

IN WITNESS WHEREOF, this Agreement has been executed as of the Effective Date.

Complainant: _____
(Signature)

Print Name: _____
Address: _____
Date: _____

Equitable: _____
(Signature of Officer)

Print Name: _____
Title: _____
Address: _____
Date: _____